IN RE MILLER, ALLEGED TO BE MENTALLY ILL.

[Cite as *In re Miller* (1992), 63 Ohio St.3d 99.]

(No. 91–154—Submitted December 4, 1991—Decided February 26, 1992.)

*Lee I. Fisher,* Attorney General, *Taryn L. Heath* and *Jack W. Decker,* for appellee.

*Ohio Legal Rights Service* and *Joseph H. Brockwell; Hahn Loeser & Parks, Neil K. Evans, Terry A. Donner* and *Jeffrey D. Van Niel,* for appellant.

ALICE ROBIE RESNICK, J.  This case presents two principal issues for our review: (1) Were appellant's due-process rights adequately protected in the

course of his involuntary commitment? and (2) Should appellant's treating psychiatrist have been allowed to testify at the commitment hearing? For the reasons which follow, we answer each question in the negative and reverse the judgment of the court of appeals.

## I

When a person faces commitment to a mental hospital against his or her will, the individual's right against involuntary confinement depriving him or her of liberty must be balanced against the state's interest in committing those who are mentally ill. It is well recognized that an involuntary civil commitment constitutes a significant deprivation of liberty requiring due-process protection. *Addington v. Texas* (1979), 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323, 330–331; *In re Burton* (1984), 11 Ohio St.3d 147, 151, 11 OBR 465, 468, 464 N.E.2d 530, 535. R.C. Chapter 5122 sets forth specific procedures to be followed when a person is committed to a mental hospital, whether voluntarily or involuntarily. When commitment is against a person's will, it is particularly important that the statutory scheme be followed, so that the patient's due-process rights receive adequate protection.

R.C. Chapter 5122 contemplates that either of two procedures may be followed when involuntary commitment is sought. One procedure is an emergency hospitalization pursuant to guidelines basically set forth in R.C. 5122.10. The other procedure is a non-emergency hospitalization pursuant to R.C. 5122.11. Each procedure requires specific due-process protections. Additionally other due-process safeguards are set forth throughout R.C. Chapter 5122; *e.g.*, R.C. 5122.05 lists the rights of involuntary patients, and R.C. 5122.141 and 5122.15 detail hearing procedure in determining whether a person is mentally ill subject to hospitalization by court order.

The factor that distinguishes an emergency involuntary commitment from a non-emergency one is the method by which the procedure is initiated. An emergency commitment is initiated by a person being taken into custody without first being afforded a hearing. See R.C. 5122.10. A non-emergency commitment, on the other hand, is commenced by the filing of an affidavit alleging facts to indicate probable cause to believe that the person is mentally ill subject to court-ordered hospitalization, thereby invoking the jurisdiction of the court. If the affidavit is sufficient to indicate probable cause, the court must either issue a temporary order of detention or set the matter for hearing. See R.C. 5122.11.

Non-emergency commitment under R.C. 5122.11 provides more extensive due-process protection than does emergency commitment, because the former commences with the filing of an affidavit rather than by the taking of the

person into custody. For that reason, non-emergency commitment should be the preferred method of involuntary hospitalization. "Where possible, the initial hearing shall be held before the respondent is taken into custody." R.C. 5122.141(F).

Even though non-emergency hospitalization is preferred, the statutory scheme recognizes that, in some circumstances, emergency hospitalization is unavoidable. Due-process rights must be protected, whichever procedure for involuntary commitment is chosen. " * * * [I]t is indisputable that involuntary commitment to a mental hospital after a finding of probable dangerousness to self or others can engender adverse social consequences to the individual. Whether we label this phenomen[on] 'stigma' or choose to call it something else is less important than that we recognize that it can occur and that it can have a very significant impact on the individual." *Addington*, 441 U.S. at 425–426, 99 S.Ct. at 1809, 60 L.Ed.2d at 331.

In the case at bar, appellant's involuntary commitment was not initiated by an affidavit, but by his being taken into custody by police officers.[1] Therefore, our consideration of appellant's due-process challenges to his emergency hospitalization begins with R.C. 5122.10.

## A

R.C. 5122.10 states that a " * * * police officer * * * may take a person into custody, * * * and may immediately transport him to a hospital * * * , if the * * * police officer * * * has reason to believe that the person is a mentally ill person subject to hospitalization by court order under division (B) of section 5122.01 of the Revised Code, and represents a substantial risk of physical harm to himself or others if allowed to remain at liberty pending examination." R.C. 5122.10 requires that "[a] written statement shall be given to such hospital by the * * * police officer * * * stating the circumstances under which such person was taken into custody and the reasons for the * * * police officer's * * * belief."

When R.C. 5122.10 is analyzed, it becomes evident that the written statement serves as a type of affidavit, to ensure that at least a minimal level of probable cause exists that court-ordered hospitalization is necessary before a

---

1. Appellant contends that no emergency existed at the time he was transported to the hospital, and that any attempt to involuntarily commit him should have commenced with an affidavit. A judge or referee at that time would have had to decide if probable cause to detain was present. See R.C. 5122.11. However, because appellant's commitment proceedings were initiated by his hospitalization, and because the statutory plan provides a procedure to safeguard due-process rights when no actual emergency is present, we begin our analysis with R.C. 5122.10.

person can be involuntarily committed. The written statement, in this case that of the police officers, is a requirement for the initiation of an emergency involuntary commitment. The transporting police officers gave no such written statement to the hospital; hence, due process was not afforded appellant at this early stage of his commitment process.

## B

When a person is involuntarily committed, R.C. 5122.05(C) requires that he or she be informed of various rights, specifically: (1) the right to make telephone calls to contact an attorney or physician; (2) the right to counsel and to an independent expert evaluation (at public expense if necessary); and (3) the right to a hearing. It is immaterial whether appellant knew of these rights, or whether he in fact exercised them. The fundamental importance of the right to counsel, and to a hearing, in civil commitment proceedings was recognized in *In re Fisher* (1974), 39 Ohio St.2d 71, 68 O.O.2d 43, 313 N.E.2d 851. Appellant was not afforded due process of law since he was not informed of the rights set forth in R.C. 5122.05(C).

## C

After a person alleged to be mentally ill and subject to court-ordered hospitalization is transported involuntarily to a hospital, R.C. 5122.10 requires that the person be examined within twenty-four hours by the hospital staff. Following the examination, the chief clinical officer [2] of the hospital has two options: if he or she believes the person is not mentally ill subject to hospitalization by court order the person must be released (unless a court has already issued a temporary detention order); or if the chief clinical officer believes the person is mentally ill subject to hospitalization by court order he or she may detain the person for up to three court days following the date of the examination. If the latter course of action is followed, and if the person has not in the meantime accepted voluntary commitment, the chief clinical

---

2. "Chief clinical officer" is defined in R.C. 5122.01(K):

"'Chief clinical officer' means the medical director of a hospital, or a community mental health agency, or a board of alcohol, drug addition, and mental health services, or, if there is no medical director, the licensed physician responsible for the treatment a hospital or community mental health agency provides. The chief clinical officer may delegate to the attending physician responsible for a patient's care the duties imposed on the chief clinical officer by this chapter. Within a community mental health agency, the chief clinical officer shall be designated by the governing body of the agency and shall be a licensed physician or licensed clinical psychologist who supervises diagnostic and treatment services. A licensed physician or licensed clinical psychologist designated by the chief clinical officer may perform the duties and accept the responsibilities of the chief clinical officer in his absence."

officer must then by the end of the third day either file an affidavit under R.C. 5122.11, thereby initiating court commitment proceedings, or discharge the patient. R.C. 5122.10.

Appellant argues that only the chief clinical officer can file the affidavit in an emergency commitment situation, and because in this case a social worker filed the affidavit, the jurisdiction of the probate court was never properly invoked. We note that "any person or persons" may file an affidavit to begin the commitment process in a non-emergency hospitalization under R.C. 5122.-11. However, in an emergency hospitalization, when the person is already in custody, the chief clinical officer is required to file the affidavit. See R.C. 5122.10.

Appellee contends that R.C. 5122.01(K) allows a chief clinical officer to delegate the duties imposed by R.C. Chapter 5122, and that therefore the social worker's signing of the affidavit did not constitute a due-process violation. It is clear that R.C. 5122.01(K) permits the chief clinical officer to delegate his responsibilities. However, the statute is somewhat ambiguous, in that it contains two different provisions that allow someone other than the chief clinical officer to perform those duties. The chief clinical officer may "delegate to the attending physician responsible for a patient's care" those duties imposed on the chief clinical officer by R.C. Chapter 5122. In the event of the chief clinical officer's absence, R.C. 5122.01(K) also provides that his or her duties may be performed by "[a] licensed physician or licensed clinical psychologist designated by the chief clinical officer * * *."

Thus, while it is arguably true that the attending physician could file an R.C. 5122.10 affidavit, we believe that the better interpretation is that either the chief clinical officer, or the designated physician or psychologist if the chief clinical officer is absent, should be the one to file the affidavit. This interpretation comports more closely with the significant responsibilities placed on a chief clinical officer under R.C. 5122.10, and also improves the likelihood that due process will be afforded.

Under no interpretation does R.C. 5122.01(K) allow a chief clinical officer to delegate his or her responsibilities to a social worker. Therefore, it was improper for Jody Allton to file the affidavit which initiated judicial commitment proceedings in this case, and the probate court erred when it accepted the affidavit to invoke its jurisdiction.[3]

---

3. We again note that if this had been a non-emergency commitment the probate court could have accepted the affidavit of "any person or persons" to invoke its jurisdiction. See R.C. 5122.11.

## D

Assuming an affidavit is properly filed in an emergency commitment situation, so that the jurisdiction of the court is correctly invoked, the commitment procedure becomes similar to a non-emergency procedure, except that the person is already in custody at the hospital. Therefore, the affidavit filed pursuant to R.C. 5122.10 must conform to the requirements of R.C. 5122.11. If the affidavit is not sufficient to indicate probable cause to order the person's detention, the court's jurisdiction is never invoked. *In re Boggs* (1990), 50 Ohio St.3d 217, 219, 553 N.E.2d 676, 679.

R.C. 5122.11 requires that the affidavit first contain an allegation setting forth the R.C. 5122.01(B) [4] category upon which the court's jurisdiction is based. That requirement is met in this case by the affidavit setting forth categories (B)(3) and (B)(4). Then, R.C. 5122.11 also requires that the affidavit contain "a statement of alleged facts sufficient to indicate probable cause to believe that the person is a mentally ill person subject to hospitalization by court order." The statute further allows the affidavit to be accompanied by, or the court to require, a certificate executed by a psychiatrist (or by both a psychologist and a physician) "stating that he has examined the person and is of the opinion that he is a mentally ill person subject to hospitalization by court order * * *."

Thus, the statutory scheme indicates that the affidavit should list concrete *facts*, and that the accompanying certificate of examination should contain an *opinion* rendered by the examining psychiatrist, or by a psychologist and a physician. The court then determines whether probable cause is present after a consideration of the statements in the affidavit and in the certificate. If

---

4. R.C. 5122.01(B) reads:

" 'Mentally ill person subject to hospitalization by court order' means a mentally ill person who, because of his illness:

"(1) Represents a substantial risk of physical harm to himself as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

"(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

"(3) Represents a substantial and immediate risk of serious physical impairment or injury to himself as manifested by evidence that he is unable to provide for and is not providing for his basic physical needs because of his mental illness and that appropriate provision for such needs cannot be made immediately available in the community; or

"(4) Would benefit from treatment in a hospital for his mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or himself."

there is no probable cause that the person is mentally ill subject to court-ordered hospitalization, the court must at that point dismiss the case.

In the present case, both the affidavit executed by the social worker and the certificate executed by the psychiatrist, Dr. Fernandez, contain the identical statement:

"Mr. Kenneth Miller is a 38 year old [C]aucasian, married male, admitted on an emergency basis on November 18, 1989. The patient has been progressively confused, delusional, and paranoid. His sense of reality is altered, grandiouse [sic] and at times, out of touch with reality."

This statement, while it may be the type of opinion that is appropriate for a psychiatrist's certificate under the statute, is insufficient to meet the requirements for the affidavit contained in R.C. 5122.11. The statutory framework envisions a situation in which the court considers the facts in the affidavit in light of the opinion contained in the certificate, offered by a trained expert who has interpreted those facts. This approach presupposes the existence of *facts* in the affidavit.

A "fact" is "[a] thing done; an action performed or an incident transpiring; an event or circumstance; an actual occurrence; an actual happening in time or space or an event mental or physical; that which has taken place." Black's Law Dictionary (6 Ed.1990) 591. Therefore, an affidavit of mental illness pursuant to R.C. 5122.11 must set forth facts which describe specific actions, incidents or events. The facts provide evidence that a person has engaged in conduct which forms the basis for a finding of probable cause that he or she may be mentally ill and in need of court-ordered hospitalization. Thus, the affidavit must contain "facts" which necessarily relate the happening of things that have been done, or of events that have taken place. In the instant case, the affidavit fails in this regard. It does not relate anything that appellant did, nor does it relate any event that took place involving him which indicates that he is mentally ill and in need of court-ordered hospitalization. Appellant contends that the statement contained in the affidavit is too conclusory to fulfill the requirements of R.C. 5122.11, and we agree. Because the affidavit was deficient, no probable cause existed to invoke the jurisdiction of the probate court. See *Boggs, supra,* at 221, 553 N.E.2d at 680. Appellant should have been discharged from the hospital on November 22, 1989, the day the invalid affidavit was filed.[5]

---

5. Appellant also contends that various other due-process violations occurred in the course of his commitment. The record is unclear as to what actually occurred during many of the events that surrounded his being taken into custody and his hospitalization. One reason for the incompleteness of the record is that the referee issued no findings of fact or conclusions of law

## II

Since this matter was not dismissed, but rather proceeded to a hearing, this court will consider appellant's assertion that the testimony of his psychiatrist was improperly used against him.

Ohio's physician-patient privilege is statutory in nature, and is codified at R.C. 2317.02(B).[6] The purpose of the statute is to create an atmosphere of confidentiality, encouraging the patient to be completely candid and open with his or her physician, thereby enabling more complete treatment. *Ohio State Medical Bd. v. Miller* (1989), 44 Ohio St.3d 136, 139, 541 N.E.2d 602, 605. The patient is encouraged to fully reveal all relevant information with no fear that the matters will later be disclosed. *State v. Antill* (1964), 176 Ohio St. 61, 64–65, 26 O.O.2d 366, 368, 197 N.E.2d 548, 551.

An early justification often given for the privilege was the stigma at one time associated with anyone who suffered from a disease of any kind, physical or mental. See Note, The Ohio Physician–Patient Privilege: Modified, Revised, and Defined (1989), 49 Ohio St.L.J. 1147, 1149. Today, because most physical diseases (with some exceptions) do not carry a stigma with them, a

---

following appellant's hearing. We base our result only on those due-process shortcomings apparent in the record.

Problems such as these, encountered by a reviewing court when it attempts to analyze whether due process was afforded to an individual facing involuntary hospitalization, illustrate that due-process rights are best protected by adhering as closely as possible to the statutory procedure when the events are occurring.

6. R.C. 2317.02 reads, in pertinent part:
"The following persons shall not testify in certain respects:
" * * *
"(B)(1) A physician * * *, concerning a communication made to him by his patient in that relation or his advice to his patient, except as otherwise provided in this division and division (B)(2) of this section * * *.
"The testimonial privilege under this division is waived, and a physician * * * may testify or may be compelled to testify in a civil action, * * * under the following circumstances:
"(a) If the patient * * * gives express consent;
"(b) If the patient is deceased, the spouse of the patient or his executor or administrator of his estate gives express consent;
"(c) If a medical claim, * * * as defined in section 2305.11 of the Revised Code [relating to medical malpractice actions], an action for wrongful death, any other type of civil action, or a claim under Chapter 4123. of the Revised Code [workers' compensation] is filed by the patient, * * *.
"(2) If the testimonial privilege described in division (B)(1) of this section is waived as provided in division (B)(1)(c) of this section, a physician * * * may be compelled to testify * * * only as to a communication made to him by the patient in question in that relation, or his advice to the patient in question, that related causally or historically to physical or mental injuries that are relevant to issues in the medical claim, * * * action for wrongful death, other civil action, or claim under Chapter 4123. of the Revised Code."

modern rationale often given for the privilege is the individual's right to privacy in communicating with his or her physician. See Note, A Uniform Testimonial Privilege for Mental Health Professionals (1990), 51 Ohio St.L.J. 741, 744.

Unfortunately, however, mental illness still carries with it a stigma that can have adverse consequences for the individual. *Addington, supra,* 441 U.S. at 425–426, 99 S.Ct. at 1809, 60 L.Ed.2d at 331. Therefore, it is argued that the physician-patient privilege is of heightened importance in the mental-health setting. Because of the nature of psychotherapy, it is important to foster open and complete communication between the psychiatrist (or psychologist) and the patient. See R.C. 4732.19 (placing the relationship between a licensed psychologist and a client on the same footing as that between a physician and patient for R.C. 2317.02[B] purposes). It is urged that if the physician-patient privilege is not scrupulously protected in the treatment of mental illness, this type of communication is threatened. A patient who anticipates that potentially damaging matters related in strict confidence may be revealed will be reluctant to communicate openly to his or her psychiatrist or psychologist. This reluctance could seriously impede the patient's chances for a recovery.

On the other hand, we also realize that society has an interest in ensuring that those mentally ill patients who present a danger to themselves or others be hospitalized. The treating psychotherapist is often in the best position to determine whether hospitalization is necessary. A psychotherapist can be placed in a dilemma when it becomes clear that one of his or her patients is likely to commit a violent act. Another factor weighing against the physician-patient privilege in this setting is that civil commitments are instituted to benefit a patient who may be unable to make competent decisions. It can be argued that because the psychotherapist is testifying for the patient's own benefit, the privilege should not apply. See Stone & Liebman, Testimonial Privileges (1983) 400–401, (Supp.1990) 274, Section 7.25.

Responding to these and other considerations, a number of states expressly render the privilege inapplicable in civil commitment proceedings. See, *e.g.,* 29B Cal.Evid.Code Section 1004 (West 1966). Other states reach the same result by providing that the privilege does not apply when a person's mental condition is at issue. See, *e.g.,* Ill.Stat.Ann. Chapter 110, Paragraph 8–802(4) (Smith–Hurd Cum.1991). See, also, *Matter of T.C.F.* (Iowa 1987), 400 N.W.2d 544, 549–550.

Ohio's physician-patient privilege statute makes no exception for civil commitment proceedings. This means that the privilege applies in the appropriate commitment situation involving a patient and his or her psychotherapist. The court of appeals correctly recognized that R.C. 2317.02(B) applied to appel-

lant's relationship with Dr. Fernandez in the case at bar. However, that court went on to find that appellant had waived the privilege because the parties stipulated to the admission in evidence of hospital records that contained Dr. Fernandez's notes at the hearing. We do not agree that this stipulation opened the door to the introduction of Dr. Fernandez's testimony regarding appellant's entire history, resulting in appellant's waiver of the privilege.

Since R.C. 2317.02(B) provides that communications between physician and patient are confidential, it is in derogation of the common law and must be strictly construed. *Weis v. Weis* (1947), 147 Ohio St. 416, 34 O.O. 350, 72 N.E.2d 245, paragraph four of the syllabus. The statute is worded so that the privilege applies unless it is waived, and then goes on to list the three instances when waiver occurs. See R.C. 2317.02(B)(1). If the situation does not meet one of the waivers expressly set forth in the statute, the privilege is not waived. *State v. Smorgala* (1990), 50 Ohio St.3d 222, 223, 553 N.E.2d 672, 674. See *State, ex rel. Lambdin, v. Brenton* (1970), 21 Ohio St.2d 21, 50 O.O.2d 44, 254 N.E.2d 681. With that in mind, we find that appellant has not expressly waived the privilege; R.C. 2317.02(B)(1)(a) does not apply. Since appellant is not deceased, R.C. 2317.02(B)(1)(b) can not apply. And since appellant has not *filed* any type of civil action to place his own physical condition at issue, no R.C. 2317.02(B)(1)(c) waiver has occurred. Lastly, the facts of this case are not so compelling that a judicially created waiver must be invoked. From this it can be seen that appellant did not waive the right to prevent Dr. Fernandez from testifying to matters covered by the physician-patient privilege.

Perhaps a different result would arise if the testimony of Dr. Fernandez at the hearing had been limited to facts he became aware of during the course of examining appellant for this commitment only.[7] That was not the case. Dr. Fernandez answered questions at the hearing based upon his entire ten-year relationship with appellant.

It is foreseeable that considerable difficulties could arise when a court limits the testimony of a physician who is both a treating and examining physician solely to his or her role as an examining physician. The scope of the physician's testimony would constantly be open to challenge. While there may be a situation in which a treating psychiatrist may act as an examining physician and testify on behalf of the state at a commitment hearing, we believe that this practice places a chilling effect upon the relationship between physician and patient. Therefore, the best procedure to be followed during an

---

7. The record is unclear whether an admission examination was ever performed by Dr. Fernandez.

involuntary commitment proceeding is to have the individual sought to be committed examined by an independent psychiatrist, thereby avoiding this situation in its entirety. (See R.C. 5122.14, which allows the court to appoint a psychiatrist, or both a psychologist and a physician, to examine the patient and report his or her findings to the court.)

Additionally, the statutory scheme contained in R.C. Chapter 5122 allows a psychotherapist to take some actions that a patient facing involuntary commitment will sometimes feel are not in his or her best interests. For example, a psychiatrist is one of the parties who may transport a person to a hospital and commit him or her on an emergency involuntary basis when the psychiatrist has reason to believe that the patient is mentally ill subject to hospitalization and represents a substantial risk of harm to self or others. See R.C. 5122.10. When the psychiatrist takes that action, he or she must file a statement with the hospital detailing the reasons behind his or her belief. Another example is that a psychiatrist may file a certificate of examination, pursuant to R.C. 5122.11, to accompany an affidavit in a commitment situation, which will assist the court in determining whether probable cause is present to detain a person involuntarily.

We do not view the taking of these actions by a psychiatrist as "testimony" for R.C. 2317.02 purposes. A psychotherapist sometimes must necessarily take action when it becomes obvious that a patient presents a threat to self or others. The physician-patient privilege places no curtailment on the freedom of action of a psychotherapist in a situation where he or she believes a patient presents a threat to society if not hospitalized.

Appellant contends that R.C. 5122.01(B)(4) is unconstitutionally vague and overbroad, both on its face and as applied to him. However, this court will not reach constitutional issues unless absolutely necessary. *Boggs, supra,* 50 Ohio St.3d at 221, 553 N.E.2d at 680; *Hall China Co. v. Pub. Util. Comm.* (1977), 50 Ohio St.2d 206, 210, 4 O.O.3d 390, 393, 364 N.E.2d 852, 854. Because we have found that appellant was not afforded due process when the requirements of R.C. Chapter 5122 were not followed, we need not consider other issues regarding the constitutionality of this chapter.

Accordingly, the judgment of the court of appeals is reversed.

*Judgment reversed.*

MOYER, C.J., SWEENEY, DOUGLAS, WRIGHT and H. BROWN, JJ., concur.

HOLMES, J., concurs in part and dissents in part.

HOLMES, J., concurring in part and dissenting in part. I concur in paragraph one of the syllabus and in Parts I(A), I(B) and I(C) of the opinion.

I dissent concerning paragraph two of the syllabus and Parts I(D) and II of the opinion.

This was an emergency involuntary commitment carried out by officers of the law. R.C. 5122.10 requires that a written statement be given by the officer to the hospital relating the circumstances under which the person was taken into custody, and the reasons for the police officer's belief as to the person's mental illness. In this proceeding, this type of information is considered as a bare requisite for probable cause for initial commitment. Although the officers in this case testified later as to the happenings at Miller's home at the time they picked him up, there in fact was no written statement submitted to authorities at the hospital. I agree that this violated the requirement of this section of the law.

I also agree that the provisions of R.C. 5122.05(C) are mandatory, and it must be shown that they were followed in order to apprise the involuntarily committed individual of his rights stated therein. Here, it was not shown that Miller had been offered these rights.

I am also in agreement that the person who filed the R.C. 5122.10 affidavit, Jody Allton, the social worker, did not have proper statutory authorization to do so. I conclude, as does the majority, that no reasonable interpretation of this section would allow a chief clinical officer to delegate his or her responsibilities to a social worker.

Having agreed with the majority upon the foregoing matters, I conclude that the application was not properly filed, and accordingly that the jurisdiction of the court to make this commitment had not been secured.

I am in disagreement with the majority concerning the insufficiency of the purported affidavit as discussed in Part I(D). Not only have the categories upon which a court may base its jurisdiction been set forth in the affidavit, but also, in general terms, Miller's condition as perceived by the affiant giving rise to a probable cause of the belief of mental illness of Miller. There is no need for a dissertation on the subject. The more detailed facts and psychiatric evidence were presented later at the court hearing.

Also, I cannot agree with the conclusion and supportive discussion contained in Part II, in that I believe it to be counterproductive to both the basic purpose of the physician-patient privilege in Ohio as well as contrary to the best public policy. As stated by the majority, the purpose of R.C. 2317.02(B) is to create an atmosphere of confidentiality, which inures to the benefit of the patient by enabling more complete treatment. Professional medical and psychiatric evidence presented by the patient's personal psychiatrist in these instances would tend to guarantee the best possible treatment for the patient. Here, Dr. Fernandez's professional relationship with Miller began in 1980. The

doctor not only worked with Miller, his patient, but also discussed Miller's condition with Miller's wife and family members. Dr. Fernandez testified that Miller had varying degrees of paranoia and schizoaffective disorder, and disorder of perception, mood and thought. The doctor concluded that these conditions grossly impaired Miller's judgment and behavior. Exemplary of the impairment of judgment is Miller's belief that mercury had been lodged in his brain and that his prescribed medication would deteriorate him; therefore, he refused to take such medication. Dr. Fernandez concluded that Miller was unable to meet his basic physical needs and the ordinary demands of life. The doctor, in recommending one of the least restrictive environments for Miller, and prescribing the medication Miller needed, was providing for the best interests of his patient.

From a public policy standpoint, as properly noted by the majority, society has an interest in ensuring that those mentally ill patients who present a danger to themselves, or others, be hospitalized. More importantly in this respect is that a person's treating psychiatrist, such as Dr. Fernandez here who had treated Miller since 1980, is most likely to be in the best position to determine whether hospitalization is necessary and proper from a medical point of view, both for the benefit of the patient and the public at large. The appellant's expert witness, Dr. Jitendra Cupala, also a psychiatrist, testified that he had only been with Miller for forty-five minutes and had spent only one and one-half hours reviewing all of the records prior to testifying, and had not talked to any members of Miller's family. It would seem patently clear which of these professionals would have a superior understanding of whether Miller met the criteria for court-ordered hospitalization (*i.e.*, Dr. Fernandez).

Some states, as noted by the majority, either by way of statute or evidentiary rule, have provided that the physician-patient privilege does not apply in a civil-commitment proceeding. An amendment to R.C. 2317.02(B) would be the most preferable method for bringing about this change in Ohio. However, this court may effect this change by its determination and decision. I would do so here.

Based upon all of the above, I would concur in the judgment and accordingly reverse the court of appeals.