Plaintiff-appellant, Carolyn Sue Willoughby ("appellant"), widow of decedent, Larry Lee Willoughby ("Willoughby"), appeals the decision of the Butler County Court of Common Pleas to award summary judgment in favor of defendant-appellee, AK Steel Corporation ("AK Steel"), in an employer intentional tort action. We affirm the decision of the trial court.
On the day of the accident, August 23, 1996, Willoughby was working as a "door operator" operating the west door machine at the Wilputte Coke Battery of the AK Steel Middletown works. Willoughby had operated the west door machine on prior occasions, although door operator was not his normal job position. The west door machine is part of a battery of coke ovens which produce coke from coal. The coal enters an oven through an opening on the top of the oven and is heated to form coke, an essential element of steel. In order to remove the coke, a hydraulically operated extractor removes the oven doors, which are located on either side of the oven.
The door operator generally works inside of an enclosed cab which has controls to operate the extractor. When the Wilputte Coke Battery was originally constructed in the 1950s, there was no enclosed cab for the operator. When the cab was created, a door operator presumably gained additional safety protection from the extractor when working inside the cab.
The doors of the oven are attached by latches, at both the top and bottom. Ideally, the latches automatically lock into place when the extractor hydraulically presses the door against the coke oven. However, the door operator sometimes leaves the enclosed cab in order to (1) hammer a latch tight with a sledgehammer, or (2) put on a "button," a particular piece of steel used to tighten a latch.
Before the accident, at the west door machine the operator could reach the oven doors by walking in two directions, on the east side or the west side of the cab. The east direction provides a longer route, but provides relatively unencumbered access to the doors. By contrast, in walking past the west side of the cab, the operator encounters a "pinch point," or narrow area. In this case, the "pinch point" is the area between the cab and the extractor.
The undisputed testimony is that, approximately one week before the accident, Willoughby was warned by John Letsche, his direct supervisor, not to walk around the west side of the cab. Prior to the accident, there was no guarding which prevented a door operator from walking around the west side of the cab. There is no record of AK Steel ever being cited for this particular safety condition prior to the accident, nor is there any written report or testimony indicating that an employee of AK Steel or the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA") ever suggested installing guarding to prevent an operator from walking around the west side of the cab until after Willoughby's accident.
When the operator hammers a latch to help close a coke oven door, it is necessary to have the hydraulic pump which operates the extractor on. At the point that the operator leaves the enclosed cab, the extractor is extended and pressed against the door of the coke oven. Without the pressure provided by the hydraulic pump, it can be nearly impossible to hammer a latch. The record indicates that AK Steel employees generally consider this a safe practice because the extractor cannot move when fully extended against an oven door. It is undisputed that AK Steel employees routinely hammered door latches with the hydraulic pump on and the extractor extended. Also, there is evidence that some door operators kept the hydraulic pump on while putting on a button with the extractor extended.
If a door operator leaves the cab while the extractor is retracted, i.e., not pressed against the oven door, the extractor can potentially move if the hydraulic pump is left on. Controls inside the enclosed cab of the door machine prevent the extractor from moving when property centered. However testimony by those who have operated the controls indicates that operating the centering controls is a matter of feel and consequently requires experience.
The Job Safety and Health Analysis ("JSHA"), prepared by AK Steel for each job title, indicates that when [p]lacing or removing door compress buttons," the hydraulic pump should be shut down when the extractor is retracted from the door. As stated, some employees would leave the hydraulic pump on while putting on a button. However, there is no evidence that employees were trained and/or required to follow this procedure, which directly contradicts the JSHA procedure for a door operator. In addition, there is no evidence that the operators were trained to leave the enclosed cab under any circumstances when the extractor was not fully extended.
The evidence shows employees of AK Steel are regularly trained on safety issues, including the general danger of pinch points. In regard to safety issues for a door operator, AK Steel prepared a JSHA of the proper procedures for operating a door machine. According to Letsche and Paul Couch, who trained Willoughby at the Wilputte Battery in November 1995 and later in March 1996, Willoughby reviewed the JSHA on operating a door machine.
At the west door machine, the danger of leaving the hydraulic pump on can be exacerbated because of the narrow area between the cab and the extractor. If the door operator chooses to travel around the west side of the extractor, the operator faces a pinch point. When the hydraulic pump is off, the extractor can still move while the pump is "bleeding." This movement is sometimes referred to in the record as "drifting." However, all the depositions indicate that this movement is small, amounting to only a few inches. The record does not suggest any trier of fact could reasonably conclude that the accident could have occurred due to the extractor drifting while the hydraulic pump was off.
Willoughby was originally trained as a door operator in approximately 1978. More recently, Willoughby was trained on a door machine at the Wilputte Battery where the accident occurred. According to Couch, the training covered the proper methods for operating a door machine. Specifically, Couch reviewed the following procedures with Willoughby: (1) always turn the hydraulic pump off, unless hammering down a latch, and (2) always walk around the east side (the side away from the cab) to hammer a latch or put on a button. The evidence of Willoughby's two training sessions with Couch is uncontradicted in this record.
In addition to the JSHA, AK Steel prepared a Quality Standard Operating Practice ("QSOP") on how to operate a door machine. However, the QSOP does not address the issue of when the hydraulic pump can be left on or the proper path to follow when leaving the cab to hammer a latch or put on a button. According to Letsche's uncontradicted testimony, a JSHA focuses in on safety risk and procedures for a particular job. By contrast, a QSOP explains procedures to be followed for a particular job to maximize product quality. Therefore, a QSOP is not geared toward safety issues, which are covered by a JSHA.
There were no eyewitnesses to the accident. There is evidence that the door Willoughby may have been handling, door number forty-six, was considered by some AK Steel employees to be a "problem door," i.e., one which does not automatically latch when the extractor is extended. Problem doors often require the latch to be sledgehammered down or a button to be placed on the door. When Willoughby was found immediately after the accident, he was caught between the "horseshoe," or back of the extractor, and the enclosed cab. The extractor was retracted. There is no direct evidence about whether Willoughby was putting on a button or sledgehammering a latch on door forty-six. The record suggests the bottom latch of door forty-six may have been completely unlatched at the time of the accident.
On November 26, 1996, appellant filed a complaint alleging, in essence, that AK Steel intentionally ignored work conditions which led to Willoughby's death. On December 5, 1997, AK Steel filed a motion for summary judgment. In the motion, AK Steel argued that the common law employer intentional tort standard was preempted by R.C. 2745.01 and that appellant failed to meet the standard for an employer intentional tort action as codified in R.C. 2745.01.[1] Alternatively, AK Steel argued that even if R.C. 2745.01 was unconstitutional and therefore inapplicable, appellant failed to meet the common law employer intentional tort standard.
On February 18, 1998, the trial court granted summary judgment in favor of AK Steel. The trial court did not decide the constitutionality of R.C. 2745.01, but instead found that appellant failed to meet the requirements of R.C. 2745.01 or the elements for a common law employer intentional tort claim. From this decision, appellant filed a timely notice of appeal and presents two assignments of error for our review:
Assignment of Error No. 1:
 The court below erred in finding no genuine issues of material fact and entering summary judgment on behalf of Defendant.
Assignment of Error No. 2:
R.C. § 2745.01 is unconstitutional.
We first address appellant's second assignment of error in which he argues that R.C. 2745.01 is unconstitutional. SeeJohnson v. BP Chemicals, Inc. (Nov. 18, 1997), Allen App. No. 1-97-32, unreported, at 32, discretionary appeal allowed,81 Ohio St.3d 1500 (R.C. 2745.01 is unconstitutional); Richey v.The Johnson Hardin Co. and XYZ Entity (July 17, 1998), Hamilton App. No. C-970767, unreported, at 2 (same); Yoder v.Greensteel Corporation (Nov. 23, 1998), Stark App. No. 1998CA00106, unreported, at 12 (same). See, also, Mullins v.Rio Algom, Inc. (1998), 81 Ohio St.3d 1430 (certified state law question from a federal district court on the constitutionality of R.C. 2745.01).
Appellant argues that R.C. 2745.01 is unconstitutional and the common law employer intentional tort standard still applies. However, as discussed with respect to appellant's first assignment of error, appellant's claim cannot meet the common law employer intentional tort standard for summary judgment, which preceded the enactment of R.C. 2745.01. Therefore, we decline to address the constitutionality of R.C.2745.01 as this case can be decided on non-constitutional grounds. Watson v. Cleaners Hanger Company (Oct. 22, 1998), Cuyahoga App. No. 74314, unreported, at 8, citing In re Miller
(1992), 63 Ohio St.3d 99, 110; Russell v. Dries and KrumpManufacturing Co. (Aug. 12, 1998), Wayne App. No. 97CA0067, unreported, at 11-12; Lamb v. The Goodyear Tire and Rubber Co.
(Dec. 16, 1998), Summit App. No. 19039, unreported, at 7-8. Accordingly, the second assignment of error is overruled as moot.
In the first assignment of error, appellant argues that the trial court erred in granting AK Steel summary judgment. We find that appellant's claim cannot meet the common law employer intentional tort standard or the requirements of R.C. 2745.01
and summary judgment was properly granted in favor of AK Steel. We address the two standards separately.
 Common Law Employer Intentional Tort Standard
In considering appellant's summary judgment motion under the common law intentional tort standard, we apply Civ.R. 56. Pursuant to Civ.R. 56(C), "the appositeness of rendering a summary judgment hinges upon the tripartite demonstration: (1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor."Harless v. Willis Day Warehousing Co. (1978), 54 Ohio St.2d 64,66. This court reviews a trial court's decision to grant summary judgment de novo. Jones v. Shelley Co. (1995), 106 Ohio App.3d 440,445.
In Fyffe v. Jeno's, Inc. (1991), 59 Ohio St.3d 115, at paragraph one of the syllabus, the Supreme Court of Ohio refined the common law standard for an employer intentional tort as follows:
 (1) knowledge by the employer of the existence of a dangerous process, procedure, instrumentality or condition within its business operation; (2) knowledge by the employer that if the employee is subjected by his employment to such dangerous process, procedure, instrumentality; and (3) that the employer, under such circumstances, and with such knowledge, did act to require the employee to continue to perform the dangerous task.
The Fyffe court explained that
 To establish an intentional tort of an employer, proof beyond that required to prove negligence and beyond that to prove recklessness must be established. Where the employer acts despite his knowledge of some risk, his conduct may be negligence. As the probability increases that particular consequences may follow, then the employer's conduct may be characterized as recklessness. As the probability that the consequences will follow further increases, and the employer knows that injuries to employees are certain or substantially certain to result from the process, procedure or condition and he still proceeds, he is treated by the law as if he had in fact desired to produce the result. However, the mere knowledge and appreciation of a risk — something short of substantial certainty — is not intent.
Id. at paragraph two of the syllabus.
Under the traditional summary judgment standard, one of appellant's arguments is that AK Steel had knowledge of and ignored dangerous conditions with respect to prior accidents which occurred at the AK Steel plant. However, we agree with the trial court that most of the prior accidents bear little resemblance to the facts of the case sub judice.
The accident which appears most similar to this one is the Michael McGuire accident. McGuire entered a pinch point between a cab and an extractor. McGuire was hit by the horseshoe (back of the extractor) and knocked through an adjacent window. McGuire apparently thought the previous door operator, whom he was replacing, had turned the hydraulics off. However, the accident was never recorded because McGuire was not injured and failed to report the incident to his supervisor. AK Steel was never made aware of the McGuire accident at any time prior to the accident in the case sub judice.
The 1979 "Snuffy" Wolfe accident is sparse in detail and the facts — to the extent known — are completely different from this case. The accident involved the east door machine and Wolfe was a maintenance worker, not a door operator. We do not find these prior accidents, or any others referenced in the record, to be evidence of past knowledge by AK Steel of any dangerous condition which may have led to Willoughby's death.
Appellant points to a repeat citation from OSHA issued subsequent to the accident on January 28, 1997, which indicates that prior to the accident, AK Steel deliberately ignored the lack of a guard to prevent an employee from traveling around the west side of the cab toward the pinch point between the cab and the extractor.[2] However, the OSHA citation does not contain any factual detail about the prior citation beyond the bare fact that the prior citation also pertained to29 CFR 1910.212(A) (11). Jim Stanley of AK Steel testified that the prior citation did not involve a door machine, and the evidence shows that AK Steel was never cited for a guarding violation on a door machine until the Willoughby accident.
We agree that the evidence may show, in retrospect, that AK Steel could have initiated any number of safety improvements, including a safety guard, to the west door machine which may have improved safety. However, the record does not support the conclusion that AK Steel knowingly ignored a safety hazard, namely that it was possible for Willoughby to walk into a pinch point by traveling around the west side of the cab. Some AK Steel employees did, prior to the Willoughby accident, walk around the west side of the cab. Nevertheless, the evidence does not show this was the correct and/or standard procedure as outlined in the JSHA and explained by Couch in Willoughby's training, nor was it required in order to perform Willoughby's job function as a door operator at the west door machine.
The other probable cause of the accident is leaving the hydraulic pump on when Willoughby left the enclosed cab. The evidence indicates that the standard procedure, as outlined in the JSHA, is to turn the hydraulic pump off when leaving the enclosed cab. The only generally practiced exception to this rule is that the hydraulic pump was left on when a latch was hammered. As previously noted, some employees left the pump on to put on a button, although this was clearly contrary to the training that Willoughby received. In any event, there is no evidence to support employees leaving and/or being trained to leave the enclosed cab with the extractor less than fully extended. As a corollary, there is no evidence that this accident could have happened unless Willoughby left the enclosed cab with (1) the hydraulic pump on, and (2) the extractor not fully extended.
Appellant argues there is evidence to support the scenario that Willoughby left the cab to visually inspect the bottom oven latch, which may have been completely unlatched at the accident scene. Appellant claims that the JSHA and the QSOP do not adequetly address this issue, and therefore Willoughby's training required him to follow a dangerous procedure. We disagree. Assuming this was Willoughby's intent, after reading the QSOP and JSHA, neither document requires a latch to be visually inspected when the extractor is retracted. More importantly, since Willoughby was inspecting a latch and not hammering a latch, he was trained by Couch to turn the hydraulic pump off. The evidence indicates that this is the procedure for inspecting a latch whether it is partially or completely unlatched. When a latch is visually inspected, the extractor may be retracted, and therefore the hydraulic pump should be off. When a latch is hammered, the extractor would be fully extended, and the hydraulic pump may be safely kept on.
The record does not support AK Steel knowingly subjecting Willoughby to dangerous procedures and/or requiring him to follow dangerous procedures. See Fyffe, at paragraph one of the syllabus. Further, there is no evidence that AK Steel was aware that Willoughby was following a dangerous procedure that was substantially certain to lead to injury or death. Indeed, Willoughby's training by Couch, if followed, would have likely avoided the possibility of this accident. All the evidence suggests this accident could only have occurred with the hydraulic pump on and the extractor less than fully extended. Since the record cannot support a claim for an employer intentional tort under the Fyffe standard, our independent review affirms the decision of the trial court that appellant's claim cannot survive summary judgment.
 R.C. 2745.01
R.C. 2745.01 states in pertinent part that:
 (A) Except as provided in this section, an employer shall not be liable to respond in damages at common law or by statute for an intentional tort that occurs during the course of employment. An employer only shall be subject to liability to an employee or the dependent survivors of a deceased employee in a civil action for damages for an employment intentional tort.
 (B) An employee is liable under this section only if an employee or the dependent survivors of a deceased employee who bring the action prove by clear and convincing evidence that the employer deliberately committed all of the elements of an employment intentional tort.
 (C) In an action brought under this section, both of the following apply:
 (1) If the defendant employer moves for summary judgment, the court shall enter judgment for the defendant unless the plaintiff employee or dependent survivors set forth specific facts supported by clear and convincing evidence to establish that the employer committed an employment intentional tort against the employee[.]
As noted by the trial court, the standard of R.C. 2745.01 is an onerous one, requiring "clear and convincing evidence" that an employer deliberately committed all the evidence of an employer intentional tort to avoid summary judgment. It is self-evident that since appellant cannot meet the common lawFyffe standard, any claim under R.C. 2745.01 must also fail because (1) the standard of proof has been raised at the summary judgment stage to clear and convincing evidence, and (2) the "deliberately" requirement of R.C. 2745.01 raises themens rea burden beyond the requirements of Fyffe. Accordingly, appellant's first assignment of error is overruled.
Judgment affirmed.
YOUNG, P.J., and POWELL, J., concur.
[1] R.C. 2745.01 became effective November 1, 1995. The statute attempts to institute two main changes to Ohio law regarding employer intentional tort standards. First, it requires the employee or dependent survivors to demonstrate "that the employer deliberately committed all of the elements of an employment intentional tort." (Emphasis added.) R.C.2745.01(B). Second, the statute appears to change the summary judgment standard for employer intentional torts from the standard normally applied, i.e., Civ.R. 56. The constitutionality of R.C. 2745.01 is currently pending before the Supreme Court of Ohio. See Johnson v. BP Chemicals, Inc.
(1998), 81 Ohio St.3d 1500 (discretionary appeal and cross appeal allowed).
[2] The violation cited AK Steel for failure to comply with29 CFR 1910.212(A)(11) because "[m]achine guarding was not provided on the West door machine on the coke oven battery to protect employees from potential contact with the door extractor mechanism, such as, but not limited to, the area of the passageway along the north side of the door machine."