OPINION
{¶ 1} Respondent-appellant, Barbara Mowen, appeals an order of the Clermont County Court of Common Pleas, Probate Division, finding her to be a mentally ill person under R.C. Chapter 5122.
 {¶ 2} On the morning of April 21, 2005, Cheryl Bolender of the Clermont Counseling Center filed an affidavit with the probate court, stating that appellant was a mentally ill person who would benefit from treatment in a hospital for her mental illness and was in need of such treatment as manifested by evidence of behavior that created a grave and imminent risk to substantial rights of others or herself. At the time, appellant had been in treatment with the center since April 2003. Specifically, the affidavit alleged that appellant's "current delusional beliefs about her [former] husband are affecting the emotional well being of her [ten-year-old] son James," and that as a result, "James is now convinced his father is going to kill him." That same day, the probate court issued an order of detention, stating: "[p]ursuant to [R.C.] 5122.11, the Court finds probable cause to believe that respondent is a mentally ill person subject to hospitalization by court order." Pursuant to the order of detention, appellant was transported that evening to Clermont Mercy Hospital.
 {¶ 3} Appellant remained hospitalized until April 25, 2005. That day, a full hearing was held before the probate court. Appellant was present at the hearing, was represented by an attorney, and testified on her behalf. By entry filed on April 25, the probate court found that appellant was a mentally ill person in need of treatment and subject to hospitalization by court order, and that Clermont Mercy Hospital was the least restrictive treatment place for appellant. A review hearing regarding appellant's placement was held on May 9. By entry filed that day, the probate court found that appellant continued to be a mentally ill person subject to hospitalization by court order but ordered that she be treated at the Clermont Counseling Center as an outpatient. This appeal follows in which appellant raises four assignments of error.
 {¶ 4} Assignment of Error No. 1:
 {¶ 5} "THE TRIAL COURT ERRED AS A MATTER OF LAW BY FAILING TO CONDUCT THE INITIAL HEARING BEFORE [APPELLANT] WAS TAKEN INTO CUSTODY, PURSUANT TO R.C. 5122.141."
 {¶ 6} Appellant argues that she was not hospitalized pursuant to R.C. 5122.11 because the probate court failed to issue a proper order of detention and conduct the initial hearing required under R.C. 5122.141 before she was hospitalized, but rather was committed in an emergency hospitalization under R.C.5122.10. The latter applies when the person committed represents a substantial risk of physical harm to self or others. Because the state failed to establish such risk, appellant contends her due process rights were violated.
 {¶ 7} It is well-established that an involuntary civil commitment constitutes a significant deprivation of liberty requiring due-process protection. In re Miller (1992),63 Ohio St.3d 99, 101. R.C. Chapter 5122 sets forth specific procedures to be followed when a person is committed involuntarily to a mental hospital. One procedure is an emergency hospitalization pursuant to R.C. 5122.10. The other procedure is a non-emergency hospitalization pursuant to R.C. 5122.11. R.C. 5122.141 and5122.15 detail hearing procedure in determining whether a person is mentally ill subject to hospitalization by court order. Id.
 {¶ 8} We disagree with appellant that she was committed in an emergency hospitalization under R.C. 5122.10. "The factor that distinguishes an emergency involuntary commitment from a non-emergency one is the method by which the procedure is initiated. An emergency commitment is initiated by a person being taken into custody without first being afforded a hearing. * * * A non-emergency commitment, on the other hand, is commenced by the filing of an affidavit alleging facts to indicate probable cause to believe that the person is mentally ill subject to court-ordered hospitalization, thereby invoking the jurisdiction of the court." Id. In the case at bar, appellant's involuntary commitment was initiated by an affidavit. Appellant does not challenge the propriety of the affidavit. The jurisdiction of the probate court was therefore properly invoked and we consider appellant's due-process challenges to her non-emergency hospitalization under R.C. 5122.11. See id.
 {¶ 9} R.C. 5122.11 states in relevant part that "[u]pon receipt of the affidavit, if a judge of the court * * * has probable cause to believe that the person named in the affidavit is a mentally ill person subject to hospitalization by court order, the judge * * * may issue a temporary order of detention * * * to take into custody and transport the person to a hospital * * * or may set the matter for further hearing.
 {¶ 10} "The person may be observed and treated until the hearing provided for in [R.C.] 5122.141. If no such hearing is held, the person may be observed and treated until the hearing provided for in [R.C.] 5122.15."
 {¶ 11} R.C. 5122.141 governs the initial hearing (also referred to as probable cause hearing) and states: "[w]here possible, the initial hearing shall be held before the respondent is taken into custody." R.C. 5122.141(F). Full hearings are governed by R.C. 5122.15.
 {¶ 12} We agree with appellant that no R.C. 5122.141 probable cause hearing was held before she was hospitalized. However, R.C.5122.141 provides only that such hearing be held before a respondent is taken into custody when possible. In addition, R.C. 5122.11 allows a respondent to be observed and treated until a R.C. 5122.15 full hearing is held in the event a probable cause hearing is not held. We therefore find that the probate court's failure to hold a probable cause hearing pursuant to R.C.5122.141 before appellant's hospitalization was not prejudicially erroneous. See In re Wilkerson (Mar. 27, 1981), Allen App. No. 1-80-16.
 {¶ 13} In the case at bar, a full hearing was held pursuant to R.C. 5122.15 only four days after the affidavit of mental illness was filed and appellant was hospitalized. During that hearing, appellant was present, represented by an attorney, and testified on her behalf. Appellant was therefore given the opportunity to counter the state's argument she was mentally ill. Due process requires notice and an opportunity to be heard. We find that appellant's due process rights were not violated.
 {¶ 14} Appellant argues, however, that she was not hospitalized under a proper order of detention because "no order of detention by the Probate Court was made pursuant to the judicial hospitalization process under R.C. 5122.11, other than an Order to hold the April 25 hearing." The record shows that on the day the affidavit of mental illness was filed, an order of detention dated that same day, signed by the probate court Deputy Clerk, and with the name of the probate judge typed on the signature line, ordered the sheriff's department to take appellant into custody and transport her to Clermont Mercy Hospital. The order was executed that day, and returned and filed on April 28, three days after the full hearing. Appellant argues that because no order of detention appears in the transcript of the docket until it was returned and filed on April 28, she was hospitalized in violation of R.C. Chapter 5122.
 {¶ 15} In support of her argument, appellant heavily relies on the transcript of the probate court docket. Such transcript shows that the order of detention was entered as an entry on April 21 and originally numbered "4," but that the number "4" was stricken out and the next entries renumbered. While the number originally given to the order of detention issued on April 21 was stricken out, we note that the transcript of docket does not cross out the entry for the order of detention. The order of detention returned by the sheriff's department and filed on April 28 is numbered "11" in the transcript of docket and journal entries.
 {¶ 16} Appellant's argument assumes that the transcript of docket has more authority than the original papers filed in the trial court and that we should rely solely on the transcript of docket. We disagree. App.R. 9(A) provides that "[t]he original papers and exhibits thereto filed in the trial court, the transcript of proceedings, if any, including exhibits, and a certified copy of the docket and journal entries prepared by the clerk of the trial court shall constitute the record on appeal in all cases." App.R. 9(A) does not support appellant's argument. Appellant failed to cite, and we have not found any authority to support her argument. We therefore find appellant's argument to be without merit. Appellant's first assignment of error is overruled.
 {¶ 17} Assignment of Error No. 2:
 {¶ 18} "THE TRIAL COURT ERRED AS A MATTER OF LAW BY ADMITTING AS EVIDENCE STATEMENTS OF AN EXPERT THAT WERE NOT RELIABLE, COMPETENT, OR MATERIAL."
 {¶ 19} The affidavit filed by Bolender alleged that pursuant to R.C. 5122.01(B)(4), appellant was a mentally ill person who would benefit from treatment in a hospital and was in need of such treatment. Under her second assignment of error, appellant argues that the probate court violated R.C. 5122.15(A)(9) when it considered the speculative opinion of Dr. Rodney Vivian because Dr. Vivian was unable to state to a reasonable degree of scientific certainty whether appellant would benefit from treatment in a hospital. R.C. 5122.15(A)(9) provides that when conducting a full hearing, the probate court "shall receive only reliable, competent, and material evidence."
 {¶ 20} During the April 25 hearing, Dr. Vivian testified that while appellant presented herself as intelligent and lucid, she was also illogical, paranoiac, had poor judgment, and was mentally ill. Dr. Vivian acknowledged there were concerns that appellant's fear her former husband was intent on harming her son would cause psychological damage to James. Dr. Vivian, however, admitted that based on his interaction with appellant and having not met James, he could not state whether appellant created a grave and imminent risk to her son. Dr. Vivian stated that he needed to hear more on that issue before he could give a final conclusion. In his words, "often times these hearings are fact finding and we make recommendations based on the information that comes up in the hearing. * * * [H]earing the testimony of other historians, reporters and observers will certainly give us an indication as to whether further evaluations would be warranted."
 {¶ 21} Following this initial testimony, Dr. Vivian was permitted to hear the testimony of Peg Fisher, the principal of the school where James was enrolled. Fisher testified that during this school year, James had been absent 24 days and late 25 times, and was failing reading, math, and social studies. James was having difficulties with other children because he smelled of urine frequently, and seemed frequently depressed and withdrawn. James was also terrified and living under the constant fear that his father wanted to kill him and that he was in imminent danger from his father. Such fear was illustrated in two drawings from James. One portrayed James' funeral; the other portrayed James' father breaking into James' house and standing over James with a knife. As a result of his fear and his daily concern for his own safety, James, although a bright young man, was unable to function in school. Fisher testified that James' fear was damaging to him, that his fears were unwarranted, and that she was concerned for James because no child "[should] have to live that way." Fisher also testified how appellant complained her former husband was attacking her through her computer and was once hidden in the bushes ready to shoot James. Fisher testified that in light of those complaints, she was worried about appellant's competency and her ability to care for James.
 {¶ 22} Following Fisher's testimony, Dr. Vivian was recalled. He testified that appellant presented a grave and imminent risk to the rights and well-being of her son, that she was mentally ill and should be held at the hospital, and that James was being harmed by his mother's illness. Dr. Vivian also testified that an intervention could be very helpful for both appellant and James, and that without attempted treatment, the situation would only worsen. Dr. Vivian further testified that "whether or not we can change or treat an illness is different from whether or not it meets criteria for treatment. Sometimes we have to make an effort at an intervention even though maybe the prognosis is guarded. I think at this point we don't have any evidence that she has failed treatment. I mean she has never had any exposure to treatment." Dr. Vivian also stated he had never been able to predict "treatability." Dr. Vivian stated that appellant's mental illness "could be treatable" but was unwilling to predict whether the treatment would be successful.
 {¶ 23} During the May 9 review hearing, Dr. Vivian testified that appellant continued to have a thought disorder and to be mentally ill, and that concerns remained as to her ability to manage her son. He also testified that appellant had been prescribed anti-psychotic medication but that they had not seen a significant change in her mental status. Dr. Vivian explained that "response to anti-psychotic medication takes a minimum of two weeks and sometimes six to eight weeks before we can say it's not going to work." He also stated that appellant's lack of self-awareness and insight into the nature of her illness were obstacles to treatment. He recommended that appellant continue to receive the anti-psychotic medication for several weeks and receive counseling but on an outpatient basis.
 {¶ 24} Upon thoroughly reviewing Dr. Vivian's testimony, we find that nothing in his testimony suggests it was unreliable, incompetent, or immaterial under R.C. 5122.15(A)(9). We note that R.C. 5122.01(B)(4) does not require that treatment be completely successful or that it cures one's illness. Rather, R.C.5122.01(B)(4) defines a mentally ill person as someone who "would benefit from treatment." Dr. Vivian testified that appellant was mentally ill, in need of treatment, and that she would benefit from treatment. We also note that appellant did not seek an independent psychiatric examination or offer any evidence from a professional that she is not mentally ill as defined under R.C.5122.01(B)(4). We find that Dr. Vivian's testimony was properly admitted by the probate court. Appellant's second assignment of error is overruled.
 {¶ 25} Assignment of Error No. 3:
 {¶ 26} "THE JUDGMENT OF THE TRIAL COURT IS CONTRARY TO LAW BECAUSE IT IS BASED ON INSUFFICIENT EVIDENCE TO SHOW BY CLEAR AND CONVINCING EVIDENCE THAT THE REQUIREMENTS OF R.C. 5122.01(B)(4) WERE MET."
 {¶ 27} Assignment of Error No. 4:
 {¶ 28} "THE JUDGMENT OF THE TRIAL COURT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 29} The crux of appellant's argument under her third and fourth assignments of error is that the state failed to establish that she was a mentally ill person as defined in R.C.5122.01(B)(4), and in particular, that she would benefit from treatment. R.C. 5122.01(B)(4) defines a mentally ill person subject to hospitalization by court order as "a mentally ill person who * * * would benefit from treatment in a hospital for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or to the person."
 {¶ 30} The state was required to establish that appellant was a mentally ill person subject to hospitalization by court order under R.C. 5122.01(B)(4) by clear and convincing evidence. Clear and convincing evidence is "that measure or degree of proof which is more than a mere `preponderance of the evidence,' but not to the extent of such certainty as is required `beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established. Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus. A trial court must use a "totality of the circumstances" test "to determine whether an alleged mentally ill person is subject to hospitalization under R.C. 5122.01(B)." In re Burton (1984), 11 Ohio St.3d 147, paragraph one of the syllabus.
 {¶ 31} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, syllabus.
 {¶ 32} In addition to the foregoing testimony of Dr. Vivian and Fisher, the school principal, several other witnesses testified at the full hearing on April 25. Bolender testified she filed the affidavit of mental illness after hearing concerns from her staff regarding appellant's behavior. Officer Shane Thompson of the Union Township Police Department testified about his contacts with appellant and presented several documents indicating the multiple calls made by appellant regarding alleged threats made by her former husband. The officer stated that while the type of calls placed by appellant was not unusual in nature, "how the call was placed [was] unusual. * * * These people are always hired by her husband and they are * * * watching her * * *. And in all cases that we've gone out and checked out those situations they have been unfounded." The officer explained that the Union Township Police Department uses the code "29A" with regard to possible mental illness complaints. The officer noted that he used the code the first time he met appellant and that other officers had used it with regard to appellant. The officer also testified that appellant often calls the police about suspicious people or vehicles but that upon investigation by the police, appellant's complaints about these people or vehicles are unfounded.
 {¶ 33} The officer's first contact with appellant was in August 2004 when he responded to her complaint that her former husband was threatening to kill her. During that contact, appellant told the officer that while her husband had not threatened her personally, she had been told by a friend of his that he had hired a private detective to find and kill her. While talking to the officer, appellant brought up several other crimes that had occurred in Texas and Kettering, Ohio. Appellant would get sidetracked and not answer the officer's questions, but would instead bring up unsolicited information. It took the officer two hours to get the information he needed.
 {¶ 34} The officer's last contact with appellant was in March 2005 when appellant came to the police station to report that her former husband had followed her on Gleneste-Withamsville Road, not far from the police station, in violation of a temporary protection order ("TPO"). The officer testified he could not find a TPO in place. When asked by the officer why she had not called the police, appellant replied she had called someone else and simply wanted to go home. The officer testified how appellant's answer raised questions: "she's obviously deathly afraid of this man. But, at the time when an incident occurs where we could have responded and indeed if he was behind her, catch him, why did she not call us at the time of the incident. * * * [I]f somebody was following me that I was deathly afraid of I sure wouldn't want them following me home."
 {¶ 35} Christy Raleigh of the Clermont Counseling Center testified that appellant was diagnosed as delusional before she came to the center, that appellant, although asked not to, has talked about her former husband's desire to kill her and her son in her son's presence, and that her delusional belief about her former husband was psychologically damaging to her son. Raleigh further testified that appellant's fear of her husband and the instances of fear have increased over time and that appellant's description of different situations have embellished over time.
 {¶ 36} Raleigh gave several examples of appellant's delusional fear of her former husband. In one instance, appellant reported that she and her son were in her parking lot when she noticed a red laser beam on her son's chest. Her husband was hiding in the bushes ready to shoot her son in the heart. In another instance, appellant reported she was driving with her son when she saw the reflection of a watch on the window of another car. Based upon that reflection, appellant believed the driver of that car was her husband and started following him. The police intervened and pulled the driver over. The driver was not appellant's husband. Appellant told Raleigh that the driver either bought off the police or had fictitious license plates and a fictitious driver's license.
 {¶ 37} In a third instance, appellant told Raleigh that a "Shawn" from the National Rifle Association ("NRA") had contacted her to let her know that her husband had purchased a gun and that they were concerned for her and her son's safety. Raleigh contacted the NRA and was told that no Shawn worked there and that they do not call and warn anyone that someone has a gun. Unabated, appellant subsequently impersonated herself as an attorney, requested that the NRA sent her documentation to the effect they had notified "her client," and sent the NRA a subpoena to appear in court on March 17, 2005.
 {¶ 38} After the state rested and her motion to dismiss was overruled, appellant testified on her behalf. Appellant testified how she was taken to the hospital under the pretext of a back x-ray and subsequently admitted "with no reason." She testified about her employment, the rent she paid for a residence for her and her son, the close relationship she has with her mother, and the financial need to retain her job. She also testified about the very close relationship she has with her son and how being in a foster home was traumatizing to him. Appellant explained she had sole custody of her son "because of the discrepancies of [her] ex-husband's testimony of pedophile behavior." Appellant also explained how she transferred her son to a different school due to her concerns her husband was trying to stalk them. Appellant denied ever having been diagnosed, or given medication for mental illness.
 {¶ 39} Finally, Rita Funk, appellant's mother, testified about her daily contact with appellant, appellant's job and residence, and how appellant is a good mother who loves her son. Funk testified that appellant "wants to be loved and have people understand her as I do," and that they were "sane people." Funk testified she had never observed appellant act violently or in a way that would constitute a risk of physical harm to herself or others, including her son. Funk testified that appellant "would never ever want to harm" her son. Finally, Funk testified she knew where her former son-in-law lived and that she had seen him on her street during the day.
 {¶ 40} Based upon a thorough review of the record, and in accordance with the standards of review articulated above, we find that there is clear and convincing evidence to support the probate court's finding in its April 25 and May 9, 2005 entries that appellant is a mentally ill person subject to hospitalization by court order under R.C. 5122.01(B)(4). Likewise, we find that such finding is not against the manifest weight of the evidence. Appellant's mental illness seriously affects her son and his ability to function on a daily basis, especially at school. Appellant is in need of treatment, and while the treatment might not be as successful as hoped, Dr. Vivian clearly testified that appellant would benefit from treatment and that without treatment, appellant's behavior will only worsen. Appellant's third and fourth assignments of error are overruled.
 {¶ 41} To the extent appellant has raised other issues on appeal, we have considered them and find them to be without merit.
 {¶ 42} Judgment affirmed.
Powell, P.J., and Walsh, J., concur.