[Cite as *State v. Harris*, 2014-Ohio-4237.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

|  |  |  |
|---|---|---|
| STATE OF OHIO | : | APPEAL NO. C-130442 |
|  |  | TRIAL NOS. B-0006312 |
| Plaintiff-Appellee, | : | B-1205794 |
|  |  |  |
| vs. | : |  |
|  |  | *O P I N I O N.* |
| KEITH DOUGLAS HARRIS, | : |  |
|  |  |  |
| Defendant-Appellant. | : |  |

Criminal Appeal From: Hamilton County Court of Common Pleas

Judgments Appealed From Are:     Affirmed in B-1205794; Sentence Vacated and Cause Remanded in B-1205794

Date of Judgment Entry on Appeal:  September 26, 2014

*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*David Hoffman,* Assistant Hamilton County Public Defender, for Defendant-Appellant.

Please note:  this case has been removed from the accelerated calendar.

CUNNINGHAM, **Presiding Judge.**

{¶1}    Defendant-appellant Keith Harris brutally stabbed his girlfriend while he was on postrelease control for an earlier felony.  As a result, he was indicted for felonious assault in the case numbered B-1205794.  After a jury trial that resulted in a finding of guilt, the trial court sentenced Harris to eight years of imprisonment for the felonious assault.  The trial court also terminated Harris's postrelease control and sanctioned Harris for the postrelease-control violation by executing the prison term that had been imposed as part of the postrelease-control portion of his sentence for the earlier felony.  That prison term was journalized in the case numbered B-0006312, which had been assigned to the earlier felony.

{¶2}    Harris now appeals from both Hamilton County judgments, arguing that the trial court erred by admitting his medical records as evidence in the trial for the felonious assault, and that his conviction for felonious assault was not supported by sufficient evidence and was against the manifest weight of the evidence.  He also argues that the trial court "imposed" the sanction for the postrelease-control violation under the wrong case number and failed to properly credit him for the time he spent on postrelease control for the earlier felony.

{¶3}    For the reasons that follow, we affirm the trial court's judgment in the case numbered B-1205794.  But because the trial court erred in calculating the length of the prison term for Harris's postrelease-control violation, we vacate the sentence properly entered in the case numbered B-0006312 and remand the case to the trial court for a recalculation.

## I. Background Facts

{¶4}    At about 12:30 p.m. on August 17, 2012, Francine Thomas was dropped off at the University Hospital emergency room by a neighbor who had found her bloodied and about to collapse in front of her home on East Clifton Avenue.

2

Thomas, who had multiple and severe stab wounds to her face, neck, and chest, told the staff that her boyfriend had stabbed her earlier in the day with a jagged knife. Police officers, who had been dispatched to Thomas's house based on a neighbor's call, found pools and trails of blood, but no victim, suspect, or weapon. One trail of blood led to an open window at the rear of the building and then to a wall behind the building. A pool of blood was found in the wooded vacant lot that was on the other side of the wall.

{¶5} Hours later, Cincinnati Police Officer John Taulbee was dispatched to the street near East Clifton Avenue to investigate a report of a person with stab wounds. When he arrived, he saw a man, who he later learned was Harris, resting on the steps of an apartment building. While the paramedics worked on the stab wounds to Harris's chest, Officer Taulbee asked him who had stabbed him. Harris did not respond. But after Harris received some treatment, Officer Taulbee heard him say that he had stabbed himself and also his girlfriend, who had tried to stop him from stabbing himself.

{¶6} By the time Harris made this statement, Officer Taulbee, who knew that a "Keith Harris" was a suspect in a felonious assault that had occurred earlier that day at a different address, had learned Harris's name from a paramedic. Officer Taulbee relayed Harris's statement to other investigating officers. These officers later searched the wooded area between Thomas's home and the location where Harris was found, but did not find a knife. The officers did, however, find Harris's personal effects and a photograph of him and Thomas in Thomas's blood-strewn home.

{¶7} Harris was transported to University Hospital and admitted to the hospital for the treatment of his wounds and for a mental-health evaluation. As documented in his medical records, he told staff at the hospital, including the psychiatrist who had evaluated him, that he had stabbed his girlfriend.

3

## II. The Case Against Harris

{¶8}     At trial, Thomas testified that she and Harris had met while attending Narcotics Anonymous meetings and that he had eventually moved in with her. Harris began relapsing, and the two agreed that if Harris returned to using drugs, he would move out.  On August 16, Thomas returned from work to an empty home. Harris called her and told her that he was coming over to return the key to her home. She knew that meant that he was high.  Harris gave her the key and left her at an ATM machine after she had withdrawn $100 for him.

{¶9}     Thomas walked home alone and fell asleep on the couch, but was awakened at about 4:00 a.m. when Harris rang her doorbell.  She reluctantly let him in after he said that he was just looking for a place to sleep that night, and they both fell asleep.  The following morning, she became angry with him when he asked to take a shower.  She threw up her hands in disgust, but said "okay."  Harris, however, walked away from the bathroom.  When she stepped into the bathroom to brush her teeth, Harris entered the bathroom, grabbed her from behind, and began sticking her with her son's sharp fishing knife.   He stuck her at least seven times, resulting in jagged cuts to her neck, chest, and face.  She fell to the floor and exclaimed that he did not have to leave.

{¶10}  Thomas saw that Harris was disturbed by the blood, and she tried to calm him while retreating to the front room of her home so she could sit on the couch and put pressure on her wounds.  Harris followed her and began stabbing himself. She told Harris that she had to leave, and he told her that she could not go with blood all over her.   She eventually "made a run for it" out of the front door.   After descending the three steps to the sidewalk, she was grabbed by a neighbor and taken to the hospital.   She underwent vascular surgery to repair an injured artery and received multiple stitches and staples to close her gaping wounds.

{¶11} Thomas's testimony was corroborated by the crime scene photographs, the testimony from the investigating officers, including Harris's admission to Detective Taulbee, and her hospital records. The state also offered into evidence Harris's medical records from University Hospital, certified in accordance with the rules of evidence, which defense counsel had obtained and produced to the prosecutor. The records contained information about Harris's self-inflicted injury and also his statement to his treating physicians that he had stabbed his girlfriend. Defense counsel objected to their admission on hearsay grounds, despite counsel's prior oral agreement that counsel would not object to their admission at trial and counsel's reference to some of the confidential contents of the records in opening statement. The trial court determined that the records fell under the business-record exception to the hearsay rule and admitted them. Defense counsel again referred to Harris's hospital records in closing argument.

### III. Analysis

{¶12} Harris's first, third, fourth, and fifth assignments of error involve the evidence admitted at trial and the finding of guilt with respect to the felonious-assault conviction. We begin with his first assignment of error, in which he contends that the trial court erred by admitting his medical records from University Hospital.

### A. Admission of Harris's Hospital Records

{¶13} Harris challenges the admission of his hospital records to the extent that they contained his statements that he had stabbed Thomas, which the state used to corroborate Thomas's and Detective Taulbee's testimony.

{¶14} Although Harris objected to the admission of the records at trial on hearsay grounds, he has abandoned that argument. Harris now contends that the records were not admissible because they contained information protected by the physician-patient privilege. Additionally, he claims that the records were not admissible because he did not testify at trial and his statements in the records were

"testimonial" as contemplated by the Confrontation Clause. Because Harris did not object to the admission of the records on either of these grounds in the trial court, we review his claim for plain error.

{¶15} To demonstrate plain error under Crim.R. 52(B), there must be an error that constitutes an "obvious" defect in the trial proceedings and that affects the defendant's "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002).

{¶16} We may reverse under a plain-error standard only where the defendant can demonstrate that "but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.* at paragraph three of the syllabus.

### 1. Confrontation Clause

{¶17} We first address Harris's claim that his hospital records were not admissible absent his testimony at trial because they contained his "testimonial" statements. He contends his statements were testimonial because he made them to a physician while he was guarded by the police and, therefore, he expected the statements to be used against him at trial.

{¶18} The Confrontation Clause of the Sixth Amendment prohibits the admission of testimonial statements of a witness who did not testify at trial, unless the person was unavailable to testify and the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004); *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

{¶19} Harris cannot seek protection from the Confrontation Clause to prohibit the admission of his *own* statements, even if they were testimonial. The right to confrontation evolved out of need to curb the abuses by the one-time routine procedure under the common law that allowed for pretrial examinations of witnesses to be read in court during criminal trials instead of live testimony. *Crawford* at 43. The right essentially embodies a procedure to test the truth of accusations admitted at a criminal trial by witnesses against the accused—cross-examination. The right did not attach to statements by the accused, who had the ability to subject himself to cross-examination, if desired. Harris has failed to demonstrate the claimed error.

### 2. Physician-Patient Privilege

{¶20} Next Harris argues that the admission of the hospital records infringed upon Ohio's physician-patient privilege. R.C. 2317.02(B)(1) codifies the statutory privilege related to physicians, and provides that a physician shall not testify concerning a "communication" made to the physician by a patient in that relationship or the physician's advice to his patient. "The purpose of the statute is to create an atmosphere of confidentiality, encouraging the patient to be completely candid and open with his or her physician, thereby enabling more complete treatment." *In re Miller*, 63 Ohio St.3d 99, 107, 585 N.E.2d 396 (1992).

{¶21} The statute defines "communication" broadly: "acquiring, recording, or transmitting any information, in any manner, concerning any facts, opinions, or statements necessary to enable a physician * * * to diagnose, treat, prescribe, or act for a patient." R.C. 2317.02(B)(5)(a). And "a communication" includes, among other media, any medical or hospital communication such as a record, chart, letter, diagnosis, and prognosis. *Id.* Therefore, the privilege can apply to limit the admission of hospital records in addition to limiting the oral testimony of the physician. *See State v. Webb*, 70 Ohio St.3d 325, 334, 638 N.E.2d 1023 (1994); *Humphry v. Riverside Methodist Hosp.*, 22 Ohio St.3d 94, 96, 488 N.E.2d 877

(1986), *overruled in part on other grounds, State ex rel. Steckman v. Jackson,* 70 Ohio St.3d 420, 639 N.E.2d 83 (1994).

{¶22}   In this case, the hospital records admitted into evidence included statements made by Harris to his physicians for diagnosis and treatment of his physical injuries and his psychological condition.  The record, however, does not demonstrate that the admission of these communications was "obvious" error. Although the statements were arguably privileged when made, a patient can subsequently waive the privilege, and it is not clear whether Harris's conduct in this case amounted to such a waiver.

{¶23} Moreover, the admission of the records did not affect Harris's substantial rights. The incriminating statements in these records were merely cumulative to the statement admitted through Detective Taulbee's testimony, and they were not necessary to establish Harris's guilt, in light of the other evidence, including Thomas's testimony.  Thus, we cannot say that but for the error, the outcome of the trial clearly would have been otherwise.

{¶24} Ultimately, Harris has failed to demonstrate plain error in the admission of his hospital records.  Accordingly, we overrule the first assignment of error.

### B. Crim.R. 29 and Sufficiency and Weight of the Evidence

{¶25}  In his third, fourth, and fifth assignments of error, Harris contends that the trial court erred by overruling his Crim.R. 29 motion and that his conviction for felonious assault was not supported by sufficient evidence and was against the manifest weight of the evidence.  We disagree.

{¶26}  Harris was convicted of felonious assault in violation of R.C. 2903.11(A)(2), which required the state to prove that he knowingly caused harm to Thomas by means of a deadly weapon.  Harris claims that the evidence showed only that he had inadvertently stabbed Thomas while she attempted to thwart his suicide

attempt, and not that he had knowingly injured her. R.C. 2901.22(B) provides that "a person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will be of a certain nature."

{¶27} Contrary to Harris's contention, the evidence overwhelming showed that when Harris repeatedly stabbed Thomas, he did so with knowledge that he was harming her. Importantly, Thomas did not testify that Harris had inadvertently stabbed her while she interrupted his suicide attempt. Instead, she testified that Harris had brutally attacked her in the bathroom after he had grabbed her from behind while she stood at the sink to brush her teeth. Her hospital records corroborated this testimony, because they demonstrated that she had multiple, deep wounds on her face, neck, and chest. Thomas's testimony was also corroborated by the evidence at the crime scene, which showed the bloodied bathroom sink and the other soiled areas consistent with Thomas's testimony.

{¶28} Although Detective Taulbee testified that Harris had told him that he had stabbed Thomas after she tried to stop him from stabbing himself, Detective Taulbee did not testify that Harris had said that the stabbing was inadvertent.

{¶29} Under these circumstances, Harris's arguments are meritless. Accordingly, we overrule these assignments of error. *See State v. Carter*, 72 Ohio St.3d 545, 553, 651 N.E.2d 965 (1995); *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

## C. Postrelease-Control Violation Sanction

{¶30} In his second assignment of error, Harris argues that the trial court "imposed" the sanction for his postrelease-control violation in the wrong case, and that when calculating the sanction the court did not properly credit him for the amount of time he had spent on postrelease control.

9

{¶31} Harris had been placed on five years of postrelease control as a result of his felony conviction in the case numbered B-0006313. At the June 19, 2013, sentencing hearing for the postrelease-control violation, Harris's parole officer testified that Harris had begun his postrelease-control supervision on June 18, 2010, and that the adult parole authority had not sanctioned him administratively for the new felony committed on August 17, 2012. She informed the court that when counted from the date of Harris's arrest, which occurred on the date of the new offense, Harris had 1,032 days remaining on postrelease control. She acknowledged, however, that Harris was still being supervised under postrelease control on the date of his sentencing.

{¶32} The trial court converted the 1,032 days to months, sanctioned Harris for the postrelease-control violation with a prison term of 34 months and 12 days, and journalized that sanction under the case number for the earlier felony.

{¶33} The trial court's authority to sanction for a postrelease-control violation is set forth in R.C. 2929.141. This statute provides as follows:

Upon the conviction of or plea of guilty to a felony by a person on post-release control at the time of the commission of the felony, the court may terminate the term of post-release control, and the court may do either of the following regardless of whether the sentencing court or another court of this state imposed the original prison term for which the person is on post-release control:

(1) In addition to any prison term for the new felony, impose a prison term for the post-release control violation. The maximum prison term for the violation shall be the greater of twelve months or the period of post-release control for the earlier felony minus any time the person has spent under post-release control for the earlier felony. In all cases, any prison term imposed for the violation shall be reduced

10

by any prison term that is administratively imposed by the parole board as a post-release control sanction. A prison term imposed for the violation shall be served consecutively to any prison term imposed for the new felony. The imposition of a prison term for the post-release control violation shall terminate the period of post-release control for the earlier felony.

(2) Impose a sanction under sections 2929.15 to 2929.18 of the Revised Code for the violation that shall be served concurrently or consecutively, as specified by the court, with any community control sanctions for the new felony.

### 1. Journalization of Sanction for Postrelease-Control Violation

{¶34} Harris argues that the trial court erred by "imposing" the sanction for the postrelease-control violation under the case number for the earlier felony. We disagree.

{¶35} Admittedly, R.C. 2929.141 expressly directs the trial court to "impose" the sentence for the postrelease-control violation, and does not direct the court to act specifically in the earlier felony. But no language in the statute prevents the court from doing so.

{¶36} And Harris's postrelease control was a part of the original judicially-imposed sentence for his earlier felony. *See Woods v. Telb*, 89 Ohio St.3d 504, 512, 733 N.E.2d 1103 (2000), cited in *State v. Martello*, 97 Ohio St.3d 398, 2002-Ohio-6661, 780 N.E.2d 250, ¶ 26. His sentence for the prior offense, a first-degree felony, included a prison term of ten years and a mandatory five-year term of postrelease control, a violation of which subjected Harris to a prison term of the greater of 12 months or the remaining period of postrelease control.

{¶37} When a sentencing court, acting under R.C. 2929.141, "impose[s]" a prison term for a postrelease-control violation related to a new felony, the court is actually executing the prison term that was imposed as part of the postrelease-control portion of the sentence imposed for the earlier felony. *See Martello* at ¶ 19. Journalizing that judgment in the earlier felony has the practical benefit of easily notifying the necessary authorities of the execution of the previous sentence.

{¶38} Thus, because R.C. 2929.141 authorized the court to execute the prison term already imposed as part of Harris's sentence for the prior felony, and no language in the statute constrained the court from entering that judgment in the earlier felony case from the same county, we hold that Harris has failed to demonstrate that the trial court erred in "impos[ing]" the sanction for the postrelease-control violation under the case number for the earlier felony.

### 2. Calculation of Court-Ordered Sanction for Postrelease-Control Violation

{¶39} R.C. 2929.141 is dispositive of the question concerning the amount of credit the trial court should have given Harris for time he spent on postrelease control for the earlier felony. The statute provides that the court's sanction for the postrelease-control violation can be a prison term of no more than the greater of 12 months or the period of postrelease control for the earlier felony minus any time spent under that postrelease control. R.C. 2929.141(A)(1). The court must also reduce the length of the prison term by any prison term that the parole board "administratively imposed" as a postrelease-control violation. *Id.* Importantly, the statute additionally provides that if the trial court did not terminate postrelease control "upon the conviction of or plea of guilty" to the felony, then the postrelease control for the earlier felony "shall terminate" upon the trial court's "imposition" of a prison term for the postrelease-control violation.

{¶40} In this case, Harris's postrelease control, which was not administratively revoked, did not terminate until the trial court "imposed" a prison term for the postrelease-control violation. Therefore, the trial court, in accordance with R.C. 2929.141, should have credited Harris for the entire amount of time that he spent on postrelease control for the earlier felony—June 18, 2010, through June 19, 2013. Thus, the court erred by limiting Harris's credit to the amount of time he spent on postrelease control before committing the new felony.

{¶41} Accordingly, for this reason, we sustain the second assignment of error to the extent that the trial court did not properly credit Harris for the time he spent on postrelease control. The assignment of error is overruled in all other respects.

## IV. Conclusion

{¶42} We vacate the trial court's sentence for the postrelease control violation in the case numbered B-0006312, and we remand that case with instructions for the court to resentence Harris after providing Harris with the proper credit for the amount of time he spent on postrelease control, as calculated in accordance with the law and with this opinion. In all other respects, we affirm.

Judgment accordingly.

FISCHER and DEWINE, JJ., concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

13