[Cite as *In re J.L.S.,*, 2022-Ohio-3539.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In re: | : | |
| | | No. 21AP-693 |
| J.L.S., Jr., | : | (Prob. No. MI-034445) |
| [Appellant]. | : | (REGULAR CALENDAR) |

---

D E C I S I O N

Rendered on October 4, 2022

---

**On brief:** *Steven McGann*, for appellant. **Argued:** *Steven McGann*.

**On brief:** *J. Michael Evans*, for appellee. **Argued:** *J. Michael Evans*.

---

APPEAL from the Franklin County Court of Common Pleas,
Probate Division

KLATT, J.

{¶ 1} Appellant, J.L.S., Jr., appeals from a judgment of the Franklin County Court of Common Pleas, Probate Division, declaring him a mentally ill person subject to court-ordered hospitalization for a period not to exceed 90 days. For the following reasons, we affirm.

{¶ 2} On October 29, 2021, licensed Social Worker Kara Rufener submitted an affidavit of mental illness to the probate court. In the affidavit, Rufener averred that appellant was a mentally ill person subject to court order under the criteria set forth in R.C.

5122.01(B)(2), (3), and (4). The facts supporting Rufener's assertion were set forth in the

narrative portion of her affidavit as follows:

> On 10/28/2021, Netcare received a call from Columbus Police Department (CPD) Right Response Unit responder. Caller advised CPD has been to [appellant's] residence several times this week due to concerns of [appellant's] aggressive, threatening behavior, and deteriorating mental health. One call to CPD was made by a church member reporting [appellant] approached the pulpit and was "acting erratically" at a church service on 10/24/2021. When [appellant] was asked to step down, [appellant] began to "make threats." Another anonymous caller contacted CPD reporting [appellant] made threats on Facebook towards several church members and has since deleted these posts. Caller assisted in responding with CPD and observed [appellant] to be speaking rapidly, expressing grandiose thoughts, and being unable to stay on topic. [Appellant] expressed paranoid thoughts to caller concerning his mother and sister keeping him from money he believes he has inherited from his father's passing. [Appellant] has been making threats toward his mother and sister because of this. [Appellant] has trouble sleeping. CPD did not transport [appellant] as caller states "he did not meet pink slip criteria for transport."
>
> On 10/29/2021, pre-screener attempted to meet [appellant] at his residence (where he lives with the mother). A man fitting [appellant's] description answered the door and stated [appellant] was not home. The man refused to take pre-screener's contact information and shut the door. [Pre-screener] attempted a call to [appellant's] phone and left a voice-mail. No return call has been received. Pre-screener then made phone contact with a relative who confirmed the man that answered was [appellant], and he was being dishonest about his identity to pre-screener. This relative confirmed the above concerns stating [appellant] has been threatening his mother and sister, telling his mother "shut up before I slap the shit out of you" and telling them both they have to get out of "his" house (it is his mother's home). [Appellant] has been posturing aggressively towards his mother as if to strike her. [Appellant] is sleeping no more than three hours per night, not bathing, and hardly eating. [Appellant] spends his time walking in and out of the house "ranting and raving" and slamming doors. [Appellant] threatened his mother and sister saying, "here comes my friend and he's strapped" (carries a loaded firearm).

> [Pre-screener] spoke with a second relative who reported the exact same concerns, stating [appellant's] mother is fearful to return to her own home due to [appellant's] behaviors. [Appellant] believes his mother owes him money from his deceased father's estate, which is not accurate. Both relatives report these behaviors are extremely out of character for [appellant] and believe they are symptoms of mental health.
>
> Pre-screener recommends [appellant] be brought to Netcare to assist in facilitating psychiatric stabilization and to ensure the safety of [appellant] and others.

(Oct. 29, 2021 Rufener Aff. at 1.)

{¶ 3} A magistrate approved the affidavit and issued an order of detention on October 29, 2021. Appellant was taken into custody by the Franklin County Sheriff and turned over to appellee, Franklin County Alcohol, Drug and Mental Health ("ADAMH") Board. Appellant was subsequently placed at Mount Carmel Behavioral Health ("Mount Carmel") for inpatient treatment.

{¶ 4} On November 2, 2021, the probate court issued an entry appointing counsel for appellant and designating William Bates, M.D., a psychiatrist, as the court doctor. The court also scheduled an evidentiary hearing before a magistrate for November 3, 2021 to consider the affidavit of mental illness.

{¶ 5} Counsel for appellant waived appellant's appearance at the November 3, 2021 hearing. Dr. Bates provided the only testimony.[1] Based on the evidence presented, the magistrate found that appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(2). The magistrate recommended inpatient hospitalization for a period not to exceed 90 days.

---

[1] The probate court record does not include a transcript of the November 3, 2021 hearing. Our averments about the hearing derive from the magistrate's November 3, 2021 decision.

{¶ 6} On November 4, 2021, counsel for appellant filed a motion requesting a de novo hearing. Counsel maintained that appellant had intended to attend and participate in the November 3, 2021 hearing; however, a miscommunication regarding transport of appellant to the hearing prevented him from attending. The court granted the motion and issued an entry reappointing legal counsel and Dr. Bates. The court set an evidentiary hearing before a magistrate for November 5, 2021 to consider anew the affidavit of mental illness.

{¶ 7} Dr. Bates, appellant, appellant's mother, and appellant's sister testified at the November 5, 2021 hearing. Based on the evidence presented, the magistrate found that appellant was a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(2). The magistrate recommended inpatient hospitalization for a period not to exceed 90 days.

{¶ 8} On November 12, 2021, appellant, pro se, filed a document entitled "Official Request to Appeal decision rendered November 5th, 2021 by Magistrate," which the probate court construed as objections to the magistrate's decision. On November 15, 2021, the court filed an entry scheduling a hearing on the objections for November 22, 2021. Appellee filed a memorandum contra appellant's pro se objections on November 17, 2021. On November 19, 2021, appellant, through counsel, filed supplemental objections to the magistrate's decision.

{¶ 9} The probate court held a hearing on the objections on November 22, 2021.[2] Following that hearing, the court issued a judgment entry on November 22, 2021 overruling appellant's objections and adopting the magistrate's decision. The court determined that appellant "is a mentally ill individual subject to court-ordered involuntary civil

---

[2] The probate court record does not include a transcript of the objections hearing.

commitment [under R.C. 5122.01(B)(2)] and shall be committed to the Franklin County ADAMH Board for treatment for a period of time not to exceed ninety (90) days, with placement at Twin Valley Behavioral Healthcare or another appropriate facility." (Nov. 22, 2021 Jgmt. Entry at 11.) Appellant was discharged from commitment on November 24, 2021.[3]

{¶ 10} In a timely appeal, appellant assigns one error for review:

> The trial court erred in adopting the November 5, 2021 magistrate's report and decision finding that appellant suffers from a mental illness requiring hospitalization.

{¶ 11} In his single assignment of error, appellant contends the probate court erred in adopting the magistrate's finding that appellant is a mentally ill person subject to court order pursuant to R.C. 5122.01(B)(2). More specifically, appellant alleges that the trial court's commitment order is against the manifest weight of the evidence presented at the November 5, 2021 hearing. In *In re K.W.*, 10th Dist. No. 06AP-731, 2006-Ohio-4908, this court held that we will not reverse a finding that a respondent is a mentally ill person subject to court order under R.C. 5122.01 as against the manifest weight of the evidence if it is " 'supported by some competent, credible evidence going to all the essential elements of the case.' " *Id.* at ¶ 6, quoting *C.E. Morris v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978).

{¶ 12} "R.C. Chapter 5122 sets forth specific procedures for the involuntary commitment of a person to a mental hospital. In a non-emergency situation, that process commences with the filing of an affidavit of mental illness in the probate court." *In re P.A.*,

---

[3] Appellant's discharge from commitment does not render this appeal moot. An adjudication of mental illness carries a stigma and can have adverse consequences that significantly impact a person's life; accordingly, this court reviews commitment orders even if those orders have expired or the individual has been discharged. *In re P.A.*, 10th Dist. No. 17AP-728, 2018-Ohio-2314, at ¶ 8, fn. 2; *In re R.T.*, 10th Dist. No. 17AP-288, 2019-Ohio-618, ¶ 5.

10th Dist. No. 17AP-728, 2018-Ohio-2314, ¶ 9, citing R.C. 5122.11; *In re Miller*, 63 Ohio St.3d 99, 101 (1992). "In the affidavit, the affiant must state facts sufficient to indicate probable cause to believe that the person named in the affidavit is a mentally ill person subject to court order." *P.A.* at ¶ 9, citing R.C. 5122.11; *Miller* at 105. "If the probate court determines that such probable cause exists, the court may order the temporary detention of the person and/or set the matter for further hearing." *P.A.* at ¶ 9, citing R.C. 5122.11.

{¶ 13} "Ultimately, the probate court must afford the respondent, i.e., the person alleged to be mentally ill, a full hearing conducted as required by R.C. Chapter 5122 and due process of law." *Id.* at ¶ 10. "If, upon completion of the full hearing, a probate court 'finds by clear and convincing evidence that the respondent is a mentally ill person subject to court order,' the court may commit the respondent to a hospital for a period not to exceed 90 days." *Id.*, quoting R.C. 5122.15(C).

{¶ 14} Ohio law establishes a three-part test for an involuntary commitment. *In re T.B.*, 10th Dist. No. 06AP-477, 2006-Ohio-3452, ¶ 7. Each part of the test must be established by clear and convincing evidence. *Id.* Initially, there must be a substantial disorder of thought, mood, perception, orientation, or memory. *Id.*; R.C. 5122.01(A). Secondly, that disorder must grossly impair judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life. *Id.*; R.C. 5122.01(A). The third part of the test requires that the mentally ill person be subject to court order for one of the reasons set forth in R.C. 5122.01(B). The statute provides:

> (B) "Mentally ill person subject to court order" means a mentally ill person who, because of the person's illness:
>
> (1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;

(4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person[.]

R.C. 5122.01(B)(1) through (4).

{¶ 15} The person's present mental state must be evaluated upon his current or recent behavior as well as his prior dangerous propensities. *In re Burton*, 11 Ohio St.3d 147, 149 (1984). R.C. 5122.01(B) affords the probate court broad discretion to review the person's past history in order to make a well-informed determination of his present mental condition. *Id.* Consistent with this broad discretion, the Supreme Court of Ohio has directed trial courts to apply a "totality of the circumstances" test in determining whether a person is subject to hospitalization under R.C. 5122.01(B). "This test balances the individual's right against involuntary confinement in deprivation of his liberty, and the state's interest in committing the emotionally disturbed." *Burton* at 149. The factors a court must consider include, but are not limited to: (1) whether in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if

needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations, and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.  The trial court may also consider other relevant evidence in making an informed decision about the person's present medical condition.  *Id.* at 149-50.

{¶ 16}  At the November 5, 2021 hearing, Dr. Bates testified[4] on direct examination that he examined appellant at the hospital on November 2, 2021 and reviewed his medical records for purposes of the hearing.  Dr. Bates opined to a reasonable degree of medical certainty, taking into consideration his education, training, experience, and review of appellant's medical records, and based in part upon his personal examination and observation of appellant, that appellant suffered from schizoaffective disorder.  Dr. Bates further opined that appellant's mental illness substantially disturbed his thought and mood, which resulted in gross impairment of his judgment.  When asked to opine about whether appellant represented a substantial risk of physical harm to himself or others, Dr. Bates responded, "Apparently.  He's not suicidal.  I don't think [he] wants to harm himself, but he's made a lot of threats to others to the point that there have been concerns about the safety of others.  So he appears to represent a danger to others."  (Nov. 5, 2021 Tr. at 8.)

---

[4] Both parties stipulated to Dr. Bates' qualifications as an expert in psychiatry.

{¶ 17} Dr. Bates considered appellant to have a good prognosis for stabilizing and returning to the community. With respect to the least restrictive environment for his treatment, Dr. Bates opined that appellant needed to have medication administered and adjusted in an in-patient psychiatric setting.

{¶ 18} To support his opinions, Dr. Bates stated:

> [A]pparently he showed some changes in his behavior recently that were of concern to family and members of the community, particularly in his church.
>
> There were calls to Netcare and the police department. The police department was out to check on him a couple of times. He had done some things like he was becoming more and more irritable with his mother apparently thinking that she was cheating on money from his father's passing.
>
> He was in church. Callers called the police and Netcare about some of his behaviors in church where he went up to the front of the church and started making threats to people. There were a number of Facebook threats, according to church members.
>
> When he was evaluated, there seemed to be a lot of grandiosity. He was showing flight of ideas. Some pressured speech with associations, making threats to family members, having some trouble sleeping.

*Id*. at 8-9.

{¶ 19} On cross-examination, Dr. Bates was asked to describe his November 2, 2021 examination of appellant. To that end, Dr. Bates testified that when he arrived at the facility, he informed a staff member he was there to see appellant. The staff member responded, "we need to be really careful with him [because] he has been very explosive"; the staff member also stated that the staff was "worried" about appellant. *Id*. at 10. The staff member escorted Dr. Bates to the examination and remained with him throughout the encounter with appellant.

{¶ 20} During the examination, Dr. Bates explained to appellant why he was in the hospital. Although appellant was hesitant to discuss the issue, he indicated that he did not think he needed to be there. Dr. Bates averred that appellant did not exhibit any aggressive or agitated behavior toward him during the examination, and he did not observe any "disturbances of thought or mood" in appellant. *Id.* at 12. According to Dr. Bates, appellant presented "sort of a flat affect, unresponsive * * * very non-expressive." *Id.* at 11. At the conclusion of the examination, appellant thanked Dr. Bates for coming and was "very pleasant" to him. *Id.* at 10.

{¶ 21} Dr. Bates further testified that although he did not observe any disturbances of appellant's thought or mood during the examination, "[t]he record certainly indicates that there's a lot of paranoia and delusions." *Id.* at 12. Dr. Bates averred that he based his opinion about appellant's mental illness in "major part" on his review of the record rather than his personal observation of appellant. *Id.* at 13. He explained: "A lot of times patients don't want to say anything. So then you have to balance what do I have. If the patient is not willing to talk about a lot of things, then you don't get that information." *Id.* at 13. When asked whether appellant's medical records indicated that there had been improvement in appellant's overall condition since his admission, Dr. Bates responded that the staff member who escorted him to the examination reported that appellant was "doing better that particular day." *Id.*

{¶ 22} Dr. Bates acknowledged that he had not spoken with appellant since the November 2, 2021 examination; however, he maintained that appellant still required hospitalization. He further opined that as long as appellant was cooperative, continued to take his medication and did not cause any problems, there was a possibility he could be discharged from commitment within a week or two.

**{¶ 23}** Appellant also testified at the November 5, 2021 hearing. Appellant averred that he lived with his mother, held bachelor's and master's degrees, coached youth sports, and had never been hospitalized or diagnosed with a mental illness. According to appellant, he had never met Dr. Bates. He disagreed with Dr. Bates' diagnosis of mental illness and disputed the allegations set forth in Ms. Rufener's affidavit, stating they were "[n]ot at all" accurate. *Id.* at 17-18.

**{¶ 24}** With regard to his alleged erratic behavior at the October 24, 2021 church service, appellant explained that after the church service ended, he and the organist, as was their custom, began performing a musical number. According to appellant, the pastor apparently "had a problem" with the performance and told a church member to "shut it down." *Id.* at 18. The church member then "strong-armed" appellant out of the church through the back door. *Id.*

**{¶ 25}** Appellant denied that he posted threatening messages on Facebook directed at church members. He also denied making threats toward his family members. He acknowledged, however, that his mother and the church pastor (who made the anonymous telephone call to the police) had each obtained a civil protection order against him. Appellant further testified that numerous individuals, including his mother, his sister, his sister's husband, the pastor, and Netcare employees, wanted to sabotage his career and future.

**{¶ 26}** Appellant averred that he refused to take medication prescribed at the hospital because he did not need it. He reiterated that he had never met Dr. Bates. According to appellant, Dr. Bates only met with a member of the hospital medical staff and reviewed his file. Appellant claimed that the documents included in his medical file were "forged* * * to make me look like I'm somebody I'm not, which is a monster." *Id.* at 27.

{¶ 27} Appellant's mother, D.S., corroborated appellant's testimony regarding his living arrangements, educational achievements, and involvement in youth sports. She also agreed that appellant had never before been diagnosed with a mental illness. D.S. testified that she was familiar with the allegations set forth in the affidavit of mental illness and acknowledged that she had made statements to Netcare representatives regarding her concerns about appellant's behavior. D.S. was present at the October 24, 2021 church service; although she did not witness appellant's behavior, she "heard about it." *Id.* at 31. Shortly after returning home from church that Sunday, appellant told her the pastor had called and asked to meet with him. Appellant asked D.S. if she knew the reason for the pastor's call; appellant yelled at her and said he would slap her if she told anyone about it. Regarding appellant's alleged Facebook threats against the pastor and church members, D.S. averred that she did not personally observe the Facebook posts; however, she received text messages from people expressing concerns about her well-being in light of the Facebook threats.

{¶ 28} In the week following the church service, appellant's increasingly disruptive and disturbing behavior made it difficult for D.S. to work (since she worked from home). In addition, appellant often threatened violence against D.S., which on one occasion included a reference to a friend of his who owned a gun. According to D.S., the police were called to the house several times. D.S. averred that she spent two nights at her daughter's house because "[e]very time I turned around, he was going off on me and * * * I was just scared." *Id.* at 35. Appellant's behavior caused D.S. to obtain a civil protection order against him.

{¶ 29} D.S. acknowledged the possibility that appellant's behavior may have been triggered by the recent deaths of his father and grandmother. In particular, D.S. noted that

after his father's death, appellant believed that he owned the house and often ordered D.S. to leave. However, D.S. stated that "I think [there] is a lot of other stuff going on, too," including that appellant was smoking a lot of marijuana. *Id.* at 45, 49.

{¶ 30} When asked to comment on appellant's testimony, D.S. stated that appellant seemed "[a] little bit better" than he was when he went to the hospital; however, she opined that "something is still there that's not right." *Id.* at 33.

{¶ 31} L.C., appellant's sister, testified that following their father's death, appellant believed that he was entitled to his parents' house (even though the father died intestate) and often "torment[ed] and harass[ed]" his mother about it. *Id.* at 55. L.C. rebuffed the suggestion by appellant's counsel that appellant was just "kind of a jerk when it comes to this kind of stuff" and was not mentally ill. *Id.* at 56. Specifically, L.C. stated that "I think there's something wrong. That's * * * not my brother." *Id.* at 57.

{¶ 32} In his assignment error, appellant for the most part does not challenge the probate court's findings that clear and convincing evidence supported the first two prongs of the statutory test under R.C. 5122.01(A). Appellant, however, argues that the probate court erred in finding that clear and convincing evidence supported the third prong that appellant, because of his mental illness, represents a substantial risk of physical harm to others. R.C. 5122.01(B)(2).

{¶ 33} More specifically, appellant contends that Dr. Bates' opinion as to that issue was based solely on the hearsay statements contained in Rufener's affidavit. Initially, we note that an affidavit submitted pursuant to R.C. 5122.11 must be based on either "reliable information" or "actual knowledge." R.C. 5122.11. That the statute does not require an affidavit to be based on "actual knowledge" contemplates that it may be based on hearsay, as long as that hearsay constitutes "reliable information." Here, it appears that Rufener's

affidavit was not based upon her actual knowledge of the events outlined therein.  Neither at the hearing nor in his appellate briefing does appellant challenge the reliability of the information contained in the affidavit, other than through his own self-serving testimony.

{¶ 34} Furthermore, although Dr. Bates alluded to the statements contained in the affidavit, he did not expressly state that his opinion was based solely on those statements.  Indeed, Dr. Bates testified about his examination of appellant at the hospital. Further, appellant cites no case—and this court is aware of none—precluding a psychiatric expert such as Dr. Bates from reviewing statements set forth in an affidavit of mental health and incorporating those statements in formulating his assessment as to whether an individual, because of his mental illness, represents of a substantial risk of physical harm to others.  In addition, Dr. Bates provided testimony about appellant's mental illness posing a substantial risk of physical harm to others independent of the statements contained in Rufener's affidavit.   Indeed, Dr. Bates testified that immediately preceding his examination of appellant, a hospital staff member warned him that appellant was "explosive" and that the staff was "worried" about appellant; hence, the staff member accompanied Dr. Bates to the examination and stayed with him throughout the encounter. We find that the only reasonable interpretation of this testimony is that Dr. Bates believed that appellant, due to his mental illness, represented a substantial risk of harm to others.

{¶ 35} Appellant points to Dr. Bates' testimony that appellant did not exhibit any aggressive or agitated behavior toward him during the examination and that a staff member told him that appellant "was doing better that day" as evidence that appellant did not currently or presently pose a substantial risk of physical harm to others.  Appellant notes that among the *Burton* "totality of the circumstances" factors a trial court must consider are whether the individual "currently" represents a substantial risk of physical harm to

others and the psychiatric and medical testimony as to the "present" mental and physical condition of the individual. *Burton*, 11 Ohio St.3d at 149. However, appellant fails to acknowledge that those factors must be evaluated "upon *current or recent behavior as well as prior dangerous propensities of the person*" and that the trial court is afforded broad discretion "*to review this individual's past history in order to make a well-informed determination of his present mental condition.*" (Emphasis added.) *Id. Burton* does not temporally define "current or recent behavior," "prior dangerous propensities," "past history," or "present mental condition" and appellant does not direct this court to any case law setting forth bright-line rules establishing temporal parameters. In any event, Dr. Bates' testimony regarding the hospital staff member's concern for his safety on the day of the examination permitted a finding that appellant, due to his mental illness, currently posed a substantial risk of harm to others. In addition, Dr. Bates expressly testified that appellant still required hospitalization.

{¶ 36} We also note that Dr. Bates was the only psychiatric expert to testify in this matter. Appellant did not submit the testimony of an expert psychiatrist to rebut the opinions expressed by Dr. Bates.

{¶ 37} Moreover, appellant fails to acknowledge other evidence supporting the probate court's finding. D.S. testified that appellant threatened her with violence, including one occasion where he referenced a friend who owned a gun. D.S. also testified that she obtained a civil protection order against appellant and left her home for two days because she was afraid of him. Appellant acknowledged that both D.S. and the pastor obtained civil protection orders against him. While L.C. did not aver that appellant threatened her or that she was afraid of him, she did state that appellant "torment[ed] and harass[ed]" D.S.

{¶ 38} Appellant references no case law establishing that evidence of a substantial risk of physical harm to others must be provided by the psychiatric expert and/or cannot be provided by other witnesses. Indeed, this court and others have recognized lay witness testimony establishing substantial risk of physical harm to others caused by mental illness under R.C. 5122.01(B). *See, e.g.*, *In re J.F.*, 10th Dist. No. 06AP-1225, 2007-Ohio-2360 (J.F.'s father averred in his affidavit that J.F. threatened to kill her parents and her neighbors); *In re Griffin*, 9th Dist. No. 12892 (Apr. 22, 1987) (father's testimony that Griffin threatened to blow his wife's head off was clear and convincing evidence that Griffin was mentally ill and subject to hospitalization).

{¶ 39} For the foregoing reasons, we conclude that competent, credible evidence supports the probate court's determination under a clear and convincing evidence standard that appellant is a mentally ill person subject to court order because his illness represents a substantial risk of physical harm to others as manifested by evidence of recent violent behavior or recent threats that place another in reasonable fear of violent behavior and serious physical harm under R.C. 5122.01(B)(2). Accordingly, we overrule appellant's sole assignment of error and affirm the judgment of the Franklin County Common Pleas Court, Probate Division.

*Judgment affirmed.*

JAMISON and McGRATH, JJ., concur.