[Cite as *In re D.G*, 2024-Ohio-4759.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| [D.G., | : | No. 24AP-29 |
| | | (Prob. No. MI-039238) |
| Appellant]. | : | |
| | | (REGULAR CALENDAR) |
| | : | |

D E C I S I O N

Rendered on September 30, 2024

**On brief:** *Christopher Signil*, for appellant.

APPEAL from the Franklin County Court of Common Pleas,
Probate Division

MENTEL, P.J.

{¶ 1}    Appellant, D.G., appeals from a judgment entry of the Franklin County Court of Common Pleas, Probate Division, overruling objections and ratifying the magistrate's decision to declare him a mentally ill person subject to involuntary civil commitment. For the reasons that follow, we affirm.

**I. FACTS AND PROCEDURAL HISTORY**

{¶ 2}    On December 11, 2023, Dr. Yiu-Chung Chan submitted an affidavit of mental illness to the probate court regarding D.G. In the affidavit, Dr. Chan averred that D.G. was a mentally ill person subject to court order under the criteria listed in R.C. 5122.01(B)(3) and (4). Dr. Chan set forth the facts supporting his assertion in the narrative portion of the affidavit as follows:

> [D.G.] is a 30[-]year-old male with a past psychiatric history of schizophrenia who was brought to Ohio State University Medical Center (OSUMC) Emergency Department (ED) involuntarily on an expired Order of Detention on December 7, 2023 with psychiatric decompensation that had been occurring for two weeks. Since the Order of Detention was expired, a Pink Slip (Application for Emergency Admission) was filed stating the following, "[D.G.] is a 30-year[-]old male with a history of psychosis. He is not taking

his psychiatric medications and has been threatening his neighbors and staff at his apartment. He reportedly has not been sleeping and has been screaming on his patio. He also has paranoid delusions. [D.G.] would benefit from stabilization in an inpatient psychiatric hospital." Contact was made with patient's mother who stated that patient had [his] first episode of psychosis two years ago. Patient stayed on Abilify for 6-months before discontinuing it. He was recently placed on a 72-hour hold and placed on Latuda, but patient threw away the medication. Patient had been non-compliant with his medications, and patient's mother received calls regarding his behavior from the leasing office.

(Dr. Chan Aff. at 2.)

{¶ 3} On December 11, 2023, a magistrate found that the affidavit satisfied R.C. 5122.11 and ordered D.G. to be detained with placement at the Ohio State University Harding Hospital ("OSU"). Dr. Chan also joined an application to authorize the involuntary psychiatric treatment of D.G. filed on December 11, 2023. On December 15, 2023, a magistrate held a hearing on the affidavit at which the following evidence was adduced.

{¶ 4} Dr. William Bates testified that he is a board-certified psychiatrist licensed to practice medicine in Ohio. (Dec. 15, 2023 Tr. at 6.) Dr. Bates stated that he examined D.G. for the purposes of this hearing. (Tr. at 6.) Dr. Bates concluded, based on a reasonable degree of psychiatric certainty from his education, experience, and training as well as his examination of D.G., personal observations, and review of the medical records, that D.G. suffered from mental illness and diagnosed him with schizophrenia. (Tr. at 6-7.) According to Dr. Bates, D.G. has previously had an episode of psychiatric decompensation, was diagnosed with schizophrenia, and was treated for a period of time with Abilify. (Tr. at 8.) D.G. then discontinued the medication and became increasingly problematic at his apartment complex. (Tr. at 8.) There were reported complaints that D.G. was making too much noise and had conflicts with his neighbors. D.G. would scream and talk to himself on his patio at all hours of the day. (Tr. at 8.) Dr. Bates stated that there was a probate court order, and D.G. was taken to OSU. (Tr. at 9.) According to Dr. Bates, while D.G. is not problematic behaviorally at the hospital, he is refusing to take his medication. (Tr. at 9.)

{¶ 5} During the examination, Dr. Bates concluded that D.G. has a disturbance of thought. (Tr. at 9.) According to Dr. Bates, D.G. is misinterpreting reality and does not grasp the significance of events. (Tr. at 9.) Dr. Bates testified that D.G.'s disturbance of thought is substantial and grossly impairs his judgment, behavior, and ability to recognize reality. (Tr. at 10.) According to Dr. Bates, D.G. was not participating in outpatient therapy

so he believes D.G. needs inpatient psychiatric treatment. (Tr. at 11.) Dr. Bates testified that D.G. represents a substantial risk to others in that the nature of the behaviors in the affidavit suggests that he is interfering with the rights of others. (Tr. at 12.) Dr. Bates believes the current treatment plan is appropriate for D.G.'s needs at this time. (Tr. at 12-13.) "I think that the prognosis is good for resolution of this episode, getting him back to a functioning baseline and back to the community with the treatment that's being proposed." (Tr. at 13.) Without treatment, Dr. Bates testified that D.G. would remain the same, if not become less amenable to treatment. (Tr. at 13.) Generally, without treatment, schizophrenics suffer a "steady degeneration over time, their baseline level of function declines and they become pretty much just helpless." (Tr. at 14.) Dr. Bates testified that intervention at this point is important because the earlier the intervention the more a person benefits from treatment. (Tr. at 15.)

{¶ 6} On cross-examination, Dr. Bates stated that his interview with D.G. lasted for 15 minutes. (Tr. at 16.) Dr. Bates believed that, based on the interview, D.G. displayed a disturbance of thought and that his illness rises to a level that requires hospitalization. (Tr. at 16-17.) According to Dr. Bates, the available documents indicate D.G. has paranoia and a belief that others are out to get him. (Tr. at 18.) Dr. Bates is not aware of any documented instances since D.G.'s hospitalization of threats or signs of danger towards staff or peers at the hospital. (Tr. at 19.) Dr. Bates does not think that D.G. wants to harm himself or is self-injurious. (Tr. at 20.) Dr. Bates believes that D.G. represents a substantial risk of harm to others based on the affidavit, which states D.G. was "[t]hreatening to physically harm apartment staff and neighbors, destroyed his sink, flooding the apartment below, during all hours of the day, he will talk and scream loudly on his patio, yelled that he was being spied on and would beat on neighbors['] doors. Reported for harassing women who lived in his breezeway." (Tr. at 20-21.) Dr. Bates noted that D.G. was heard screaming loudly in his room by staff in the hospital, which Dr. Bates stated was consistent with his other behavior. (Tr. at 21.) While Dr. Bates did not personally observe any of this behavior, he posited that the hospital could provide a therapeutic environment for people who are agitated outside that environment. (Tr. at 25-26.)

{¶ 7} Dr. Chan is a board-certified psychiatrist licensed to practice medicine in Ohio. (Tr. at 29.) Dr. Chan is D.G.'s treating psychiatrist at OSU and authored the affidavit

that is before the court. (Tr. at 29.) Dr. Chan's differential diagnosis of D.G. is schizophrenia or schizophrenic spectrum disorder. (Tr. at 30.) Since his admission, D.G.'s behavior has been superficial but calm though D.G. has refused his medications. (Tr. at 30-31.) According to Dr. Chan, D.G. has had two prior hospital admissions, but he does not have those records to review. (Tr. at 32.) Regarding Dr. Chan's affidavit, the statement concerning the 72-hour hold referred to a "pink slip" when D.G. was prescribed Latuda in the hospital. (Tr. at 33.) Dr. Chan testified that D.G.'s psychiatric diagnosis is influenced by alcohol and marijuana. (Tr. at 35-37.) Dr. Chan also stated that D.G. exhibits some underlying symptoms of thought disorder. (Tr. at 36.) Dr. Chan testified that if D.G. goes untreated, "he will represent a risk to himself and also a risk to other people." (Tr. at 39.) Dr. Chan testified that D.G. would benefit from getting inpatient treatment and follow up with outpatient treatment. (Tr. at 40.)

{¶ 8} On cross-examination, Dr. Chan stated that the sources of the claims in his affidavit were based on the order of detention written by Netcare and conversations between professionals in the emergency department and D.G.'s mother. (Tr. at 43-44.) Dr. Chan noted reports of D.G. making threats of physical harm to staff and harassing his neighbors. (Tr. at 44.) Dr. Chan stated that the records indicate that the "[f]amily also reported [D.G. has] delusions that the government is following and torturing him." (Tr. at 45.) Dr. Chan explained that D.G.'s behavior in the hospital and outside the hospital are two different situations. According to Dr. Chan, D.G. is currently in a controlled supervised environment, and the hospital provides him support and education. Conversely, in an unsupervised environment, D.G. gets sicker and his behavior gets worse. (Tr. at 49.)

{¶ 9} D.G. testified that he disagrees with the two physicians' diagnoses and does not believe he has a mental illness. (Tr. at 55-56.) D.G. denied that he ever threatened people at his apartment complex and stated that the complaints of noise were exaggerated. (Tr. at 56-57.) According to D.G., a person once threatened physical violence against him at his apartment while he was walking his dog. (Tr. at 58-59.) D.G. denied that he deliberately destroyed his sink but that the sink was broken from water pressure that built up in the lines. (Tr. at 61.)

{¶ 10} On cross-examination, D.G. acknowledged that he was first hospitalized and diagnosed with schizophrenia in 2021. (Tr. at 63.) D.G. admitted that after his first

diagnosis, he stopped taking his medication before being hospitalized again in July 2023. (Tr. at 64.) D.G. acknowledged that he again stopped his medications several weeks after he was discharged from the hospital. (Tr. at 65.) D.G. conceded that three hospitals with three different psychiatric professions have all diagnosed him with mental illness. (Tr. at 66.) D.G., however, believes that these are not three separate evaluations but that the physicians all refer back to the original diagnosis. (Tr. at 66.) According to D.G., he believes that the National Security Administration ("NSA") has been spying on him and claims to have been in electronic communications with these individuals since July 2021. (Tr. at 71.)

{¶ 11} Upon the conclusion of the December 15, 2023 hearing, the magistrate issued a decision finding D.G. was suffering from a mental illness diagnosed as schizophrenia and presented as a substantial disorder of thought grossly impairing his judgment. The magistrate found that D.G. is a person with mental illness and was subject to hospitalization under R.C. 5122.01(B)(4). The magistrate ordered that D.G. be committed for involuntary hospitalization at OSU for a period not to exceed 90 days. D.G. filed objections, which the trial court overruled on December 26, 2023. (Dec. 26, 2023 Jgmt. Entry.)

{¶ 12} A hearing as to the application took place on December 27, 2023. At the hearing, Dr. Chan and Dr. Bates testified as to D.G.'s need for treatment and the proposed plan. D.G. did not testify at the hearing. The magistrate concluded that D.G. was subject to treatment and medication as described in the application and authorized OSU to treat and medicate D.G. On December 29, 2023, D.G. objected to the magistrate's decision. The trial court held a hearing on the objections. On January 8, 2024, the trial court issued a judgment entry overruling D.G.'s objections to the magistrate's decision and found the involuntary administration of psychotropic medication was appropriate.

{¶ 13} D.G. filed a timely appeal in this matter.

## II. ASSIGNMENT OF ERROR

{¶ 14} Appellant alleges the following as trial court error:

> THE TRIAL COURT ERRED IN ADOPTING THE [DECEMBER] 27, 2023 MAGISTRATE'S REPORT AND DECISION FINDING THAT APPELLANT SUFFERS FROM A MENTAL ILLNESS REQUIRING HOSPITALIZATION.

## III. STANDARD OF REVIEW

{¶ 15} This court has found the clear and convincing evidence requirement applies to involuntary commitment cases under R.C. 5122.01(B). *In re A.C.*, 10th Dist. No. 20AP-

82, 2021-Ohio-2116, ¶ 10, citing *In re P.A.*, 10th Dist. No. 17AP-728, 2018-Ohio-2314, ¶ 13, citing *State v. Schiebel*, 55 Ohio St.3d 71, 74 (1990); *accord In re R.T.*, 10th Dist. No. 13AP-291, 2013-Ohio-4886, ¶ 12. Thus, a reviewing court will not reverse a finding that a "respondent is a mentally ill person subject to court order under R.C. 5122.01 as against the manifest weight of the evidence if some competent, credible evidence going to all the essential elements of the case supports the order." *In re E.S.*, 10th Dist. No. 22AP-366, 2023-Ohio-382, ¶ 13, citing *In re J.L.S.*, 10th Dist. No. 21AP-693, 2022-Ohio-3539, ¶ 11, citing *In re K.W.*, 10th Dist. No. 06AP-731, 2006-Ohio-4908, ¶ 6, citing *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 280 (1978). "In determining whether the record contains the necessary competent, credible evidence, a reviewing court must weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the finder of fact clearly lost its way." *P.A.* at ¶ 13, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 20.

## IV. ANALYSIS

{¶ 16} In his sole assignment of error, D.G. argues that the trial court erred in adopting the magistrate's finding that he suffered from a mental illness requiring hospitalization.

{¶ 17} R.C. Chapter 5122 sets forth the procedure for the involuntary commitment of a person to a mental hospital. In a non-emergency situation, the process begins with the filing of an affidavit of mental illness in probate court. *J.L.S.* at ¶ 12, citing *P.A.* at ¶ 9, citing R.C. 5122.11. This court has required that the "affiant must set forth facts in the affidavit sufficient to indicate probable cause to believe that the person named is a mentally ill person subject to court order." *E.S.* at ¶ 14, citing *J.L.S.* at ¶ 12, citing *P.A.* at ¶ 9, citing R.C. 5122.11. In cases where the probate court finds probable cause exists, it may order the temporary detention of the person and/or set the matter for further proceeding. *Id.*

{¶ 18} In accordance with due process of law and R.C. Chapter 5122, the probate court must afford the person alleged to be mentally ill a full hearing. *E.S.* at ¶ 15, citing *J.L.S.* at ¶ 13, citing *P.A.* at ¶ 10. Once the hearing is complete, if the probate court concludes, by clear and convincing evidence, that the respondent is a mentally ill person subject to a court order, the court can commit the person to a hospital for a period not to exceed 90 days. R.C. 5122.15(C).

{¶ 19} The General Assembly has defined "mental illness" as a "substantial disorder of thought, mood, perception, orientation, or memory that grossly impairs judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life." R.C. 5122.01(A). A "[p]erson with a mental illness subject to court order" is defined as a person with a mental illness who, because of the person's illness:

(1) Represents a substantial risk of physical harm to self as manifested by evidence of threats of, or attempts at, suicide or serious self-inflicted bodily harm;

(2) Represents a substantial risk of physical harm to others as manifested by evidence of recent homicidal or other violent behavior, evidence of recent threats that place another in reasonable fear of violent behavior and serious physical harm, or other evidence of present dangerousness;

(3) Represents a substantial and immediate risk of serious physical impairment or injury to self as manifested by evidence that the person is unable to provide for and is not providing for the person's basic physical needs because of the person's mental illness and that appropriate provision for those needs cannot be made immediately available in the community;

(4) Would benefit from treatment for the person's mental illness and is in need of such treatment as manifested by evidence of behavior that creates a grave and imminent risk to substantial rights of others or the person.

R.C. 5122.01(B)(1) through (4).

{¶ 20} Given these definitions, Ohio law provides a three-part test to determine when a court should order an involuntary commitment. *E.S.* at ¶ 16, citing *J.L.S.* at ¶ 14, citing *In re T.B.*, 10th Dist. No. 06AP-477, 2006-Ohio-3452, ¶ 7. The probate court must find, by clear and convincing evidence, that: "(1) the individual suffers from a substantial disorder of thought, mood, perception, orientation, or memory, (2) the disorder grossly impairs the individual's judgment, behavior, capacity to recognize reality, or ability to meet the ordinary demands of life, and (3) the individual is subject to court order for one of the reasons set forth in R.C. 5122.01(B)." *Id.*, citing *T.B.* at ¶ 7, citing R.C. 5122.01(A).

{¶ 21} The Supreme Court of Ohio has set forth a totality of circumstances test to determine whether a person is subject to hospitalization under R.C. 5122.01(B)(1) through (4). *In re Burton*, 11 Ohio St.3d 147, 149 (1984). *Burton* provides that a court, when determining if an individual is a mentally ill person under R.C. 5122.01(B), must consider the person's present mental state based on both his current or recent behavior as well as

his prior dangerous propensities. *E.S.* at ¶ 15, citing *J.L.S.* at ¶ 15, citing *Burton* at 149. The probate court is afforded broad discretion to review an individual's prior history to reach a well-informed decision as to an individual's present mental condition. *E.S.* at ¶ 17, citing *Burton.* The Supreme Court has provided a nonexclusive list of factors a probate court must consider when determining whether a person is subject to hospitalization under R.C. 5122.01(B). *Burton* provides the following factors:

> (1) whether, in the court's view, the individual currently represents a substantial risk of physical harm to himself or other members of society; (2) psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent; (3) whether the person has insight into his condition so that he will continue treatment as prescribed or seek professional assistance if needed; (4) the grounds upon which the state relies for the proposed commitment; (5) any past history which is relevant to establish the individual's degree of conformity to the laws, rules, regulations and values of society; and (6) if there is evidence that the person's mental illness is in a state of remission, the court must also consider the medically suggested cause and degree of the remission and the probability that the individual will continue treatment to maintain the remissive state of his illness should he be released from commitment.

*Burton* at 149-50.

{¶ 22} To be sure, the probate court is not restricted to the above factors, and it may, in its discretion, consider other relevant evidence to make an informed decision as to the individual's present mental condition. *Burton* at 150.

{¶ 23} D.G. contends that the probate court erred when it adopted the magistrate's decision because the statutory elements were not proven by clear and convincing evidence. Specifically, D.G. argues that the probate court's decision must be reversed because the "evidence failed to show that Appellant represented a substantial risk of physical harm to himself or other members of society, the psychiatric and medical testimony as to the present mental and physical condition of the alleged incompetent was not supported by credible evidence; and the grounds upon which the state relies for the proposed commitment." (Appellant's Brief at 12-13.) Additionally, D.G. claims that, as required under R.C. 5122.01(B) "there was insubstantial evidence to demonstrate Appellant suffered from a 'substantial disorder of thought which resulted in a gross impairment of judgment, behavior, capacity to recognize reality, and ability to meet the ordinary demands of life.' " (Appellant's Brief at 13.) According to D.G., the record is devoid of any evidence based on personal observations by the court-appointed independent psychiatrist of behavior or

symptoms that support a finding that D.G. was a risk to himself or others.  D.G. argues that the physicians' assessment of risk was based on his history rather than specific interactions with the physician.  According to D.G., the only statements that supported the findings were from the affidavit, which he denied and could not be substantiated from physicians' personal observations.  (Appellant's Brief at 14.)

{¶ 24}  Upon review, we find competent, credible evidence in the record to support the probate court's determination that D.G. is a mentally ill person subject to court order pursuant to the criteria set forth in R.C. 5122.01(B)(4).  As an initial matter, we note that an affidavit submitted pursuant to R.C. 5122.11 must be based on "actual knowledge" or "*reliable information * * * whichever is determined to be proper by the court*." (Emphasis added.)  R.C. 5122.11.  Because the statute does not mandate that a R.C. 5122.11 affidavit be based on actual knowledge, the legislature contemplated that it can be based on hearsay evidence as long as the court finds that evidence constitutes "reliable information."  *J.L.S.* at ¶ 33.  Here, while the affidavit does not appear to be based on Dr. Chan's actual observations, the court found the information reliable.  D.G. has presented no evidence that contradicts the substance of the affidavit outside his own self-serving testimony.  Furthermore, Dr. Bates interviewed D.G. in the hospital and reached his own professional opinion as to his diagnosis.  (Tr. at 6, 16.)  Dr. Bates testified that, in addition to the information in the affidavit and his interview with D.G., the available medical records noted the staff reported D.G. was heard screaming loudly in his hospital room.  (Tr. at 21.)  As such, it was apparent that Dr. Bates did not base his opinion solely on the affidavit.  In any case, even if Dr. Bates did review the contents of Dr. Chan's affidavit and incorporated the affidavit into his general findings, D.G. points to no authority that would prevent a psychiatric expert from reviewing the statements contained in the R.C. 5122.11 affidavit and incorporating those statements into his final opinion as to whether an individual is a mentally ill person subject to a court order under R.C. 5122.01(B).  This court has reached this same conclusion on several occasions.  *See*, *e.g.*, *E.S.* at ¶ 20; *J.L.S.* at ¶ 34 ("appellant cites no case—and this court is aware of none—precluding a psychiatric expert such as Dr. Bates from reviewing statements set forth in an affidavit of mental health and incorporating those statements in formulating his assessment as to whether an individual, because of his mental illness, represents of a substantial risk of physical harm to others"); *A.C.* at ¶ 30.  Based on a reasonable degree of psychiatric certainty from education, training

and experience, examination, personal observations, and review of the medical records, Dr. Bates testified that D.G. suffers from mental illness and diagnosed him with schizophrenia. (Tr. at 6-7.)

{¶ 25} D.G. argues that Dr. Bates failed to personally view any of the behaviors that support his claim that D.G. presented a risk of harm to himself or others, or that he was incapable of taking in or processing medical information. (Appellant's Brief at 8, 13.) We find this argument without merit. While part of the *Burton* factors consider whether an individual "currently" represents a substantial risk of physical harm to others, and psychiatric and medical testimony as to the present mental and physical condition of the individual, the factors must be evaluated "*upon current or recent behavior as well as prior dangerous propensities of the person.*" (Emphasis added.) *Burton* at 149. The trial court is also afforded broad discretion "to review the individual's past history in order to make a well-informed determination of his present mental condition." *Id.* This court has found that "*Burton* does not temporally define 'current or recent behavior,' 'prior dangerous propensities,' 'past history,' or 'present mental condition.' " *J.L.S.* at ¶ 35; *see also E.S.* at ¶ 21. Here, only four days lapsed from the time that Dr. Chan filed the affidavit to the hearing before the magistrate. Regardless, Dr. Bates provided a medical opinion as to D.G.'s mental illness and concluded that he posed a substantial risk of harm to others. Similarly, Dr. Chan is D.G.'s treating physician at OSU and authored the affidavit that is before the court. (Tr. at 29.) Dr. Chan concluded that if D.G. goes untreated, "he will represent a risk to himself and also a risk to other people." (Tr. at 39.) As acknowledged by D.G., three hospitals with three different physicians have all found that D.G. is mentally ill and diagnosed him with schizophrenia. D.G. has presented no other competing psychiatric expert to contest the two physicians' testimony.

{¶ 26} We also note that D.G.'s own testimony resolved many of his alleged evidentiary concerns. D.G. testified that he has been diagnosed with schizophrenia since 2021 and had various altercations, the degree of which he disputes, with his neighbors. Most tellingly, D.G. fully acknowledged his belief that the NSA was spying on him. Given the above testimony from the two psychiatrists, as well as the testimony by D.G., we find there was competent, credible evidence in the record to support the probate court's

determination that there was clear and convincing evidence that D.G. is mentally ill and subject to court order under R.C. 5122.01(B)(4).

{¶ 27} D.G.'s sole assignment of error is overruled.

## V. CONCLUSION

{¶ 28} Having reviewed the entire record in light of the *Burton* factors, we find competent, credible evidence in the record to support the probate court's determination, under a clear and convincing evidence standard, that D.G. is a mentally ill person subject to court order under R.C. 5122.01(B)(4). As such, we overrule D.G.'s sole assignment of error, we affirm the judgment of the Franklin County Court of Common Pleas, Probate Division.

*Judgment affirmed.*

BEATTY BLUNT and BOGGS, JJ., concur.

————————————